UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

UNITED STATES OF AMERICA :

-v- :

ARMEN KAZARIAN,
a/k/a "Pzo,"
a/k/a "Qerop,"
DAVIT MIRZOYAN,
ROBERT TERDJANIAN,
a/k/a "Robik,
a/k/a "Oleg Kamarine,
a/k/a "Robert Vovk,"
ALEKSANDR AVETISYAN,
a/k/a "Vladimir Arushunyan,"
HERAYER BAGHOUMIAN,
a/k/a "Vazken,"
POGOS SATAMYAN,
ARTUR YEPISKOPOSYAN,
a/k/a "Butania,"
VAGAN STEPANIAN,
VARUJAN AMROYAN,
a/k/a "Varush,"
JACOB POGOSIAN,
KAREN SIMONIAN,
VARTAN BOYZADZHYAN,
a/k/a "Levon Papikan,"
a/k/a "Ararat Bedrousian,"
ARTUR MANASARIAN,
GOURGEN MIRIMANIAN,
a/k/a "Edo,"
MANUK MURADAKHANYAN,
a/k/a "Manch,"
LIANA SOGHOYAN,
TIKRAN TAKVORYAN,
GAYANE KHATCHATURYAN,
GAGIK KYURKCHYAN,
ANNA ZAICHIK,
ARON CHERVIN,
KAREN AHARONIAN,
ARMEN GRIGORIAN,
KAREN MARKOSIAN,
ANNA TERMARTIROSYAN,
MICHAEL DOBRUSHIN
SAMVEL HAKOPYAN, and
RAFIK TERDJANIAN,

Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

10 Cr. 895

**DETENTION MEMORANDUM**

**MEMORANDUM IN SUPPORT OF THE DETENTION WITHOUT BAIL OF CERTAIN DEFENDANTS**

The Government moves for the detention of certain of the defendants charged in the above-captioned indictment. These defendants include, but are not necessarily limited to, the following: ARMEN KAZARIAN, a/k/a "Pzo," a/k/a "Querop," ALEKSANDR AVETISYAN, "a/k/a "Vladimir Arushunyan," DAVIT MIRZOYAN, ARTUR YEPISKOPOSYAN, a/k/a "Butania," HERAYER BAGHOUMIAN, a/k/a "Vazken," VARTAN BOYADZHYAN, a/k/a "Levon Papikan," a/k/a "Ararat Bedrousian." ROBERT TERDJANIAN, a/k/a "Robik," a/k/a "Oleg Kamarine," a/k/a "Robert Vovk," a/k/a "Robert Vovk," VAGAN STEPANIAN and VARUJAN AMROYAN, a/k/a "Varush,"[1] The Government will make a determination as to whether or not to seek detention with respect to additional defendants following their arrests and a review of their Pretrial Service Reports. Additionally, certain defendants – including some referenced above, and others who are not – will have ICE detainers filed against them[2] meaning

---

[1] Two defendants in the SDNY indictment are also charged in other simultaneously unsealed indictments: POGOS SATAMYAN (charged in a Central District of California indictment that is not directly related to the SDNY indictment) and ARTUR MANASARIAN (charged a Southern District of Georgia that does relate to the SDNY indictment). SATAMYAN and MANASARIAN are expected to initially be arrested and presented on the other indictments, meaning that, initially, bail will not be assessed in relation to the SDNY proceeding. The Government understands that prosecutors in the Central District of California and Southern District of Georgia cases are likely to seek detention in those case. Given this, this Memorandum does not address SATAMYAN and MANASARIAN, but the Government does expect to seek their detention if they are not already detained at the time of their appearance in the SDNY proceeding.

[2] These Government understands that the defendants subject to ICE detention include the following: ARMEN KAZARIAN, ROBERT TERDJANIAN, VARUJAN AMROYAN, LIANA SOGHOYAN, GAYANE KHATCHATURYAN, KAREN AHARONIAN and RAFIK TERDJANIAN. This information may change at the time of the arrests, and ICE may file detainers on additional defendants.

that if they obtain bail in this case they will be transferred to ICE detention where they will not receive credit towards any sentence imposed in the present case and where they will have to be writted to appear in Manhattan Federal Court for each court proceeding. Accordingly, these defendants may not wish to seek bail, or may not execute documents which would release them from federal custody even if bail is granted.

The particular bases for the Government's detention requests applicable to each defendant are set forth in the chart below.

| **Name** | **Danger?** | **Risk of Flight?** | **ICE Detainer?** | **Location of Likely Presentment** |
|---|---|---|---|---|
| KAZARIAN | X | X | X | Los Angeles |
| AVETISYAN | X | X | | Los Angeles |
| MIRZOYAN | | X | | Los Angeles |
| BAGHOUMIAN | X | X | | Los Angeles |
| YEPISKOPOSYAN | X | X | | Los Angeles |
| BOYADZHYAN | | X | | Los Angeles |
| ROBERT TERDJANIAN | X | X | X | New York |
| STEPANIAN | X | X | | New York |
| AMROYAN | X | X | X | New York |

For purposes of this memorandum, the above individuals are referred to as the Detention Defendants.

**Background**

A. <u>The Investigation And Offense</u>

In 2009 the Federal Bureau of Investigation ("FBI") and the Inspector General for the Department of Health and Human Services ("HHS") began an investigation of a group of

Armenian-Americans located in New York City and Los Angeles that were coordinating a wide range of criminal activity. The investigators obtained information from a variety of sources including (but not limited to) cooperating witnesses, victims, Medicare, banks, and ultimately many months of wiretaps on the telephones of several individuals charged in the instant indictment, including at various times TERDJANIAN, MIRZOYAN, AMROYAN, YEPISKOPOSYAN, AVETISYAN and KAZARIAN.

The above sources revealed the existence of a criminal organization dominated by Armenian immigrants and nationals residing in the New York City and Los Angeles areas, and committing a wide range of crimes from extortion to fraud to money laundering. The organization – referred to here and in the SDNY indictment as the Mirzoyan-Terdjanian Organization (or "MTO"), after the names of two of its leaders, one in Los Angeles and one in New York – has strong ties to Armenia, with its members and associates traveling to Armenia regularly, sending money Armenia (sometimes as cash on airplanes, sometimes through informal money transfer networks), purchasing real estate and operating businesses in Armenia, and maintaining ties to Armenian criminal leaders.

Leaders and members of the MTO operated under the protection of a "Vor" – in this case, defendant KAZARIAN. The term "Vor" is translated as "thief-in-law" and refers to a select group of high-level mobsters from Russia and the countries of the former Soviet Union, including Armenia. Vors regularly provide protection to (and take money from) criminal enterprises and settle disputes for members of such criminal enterprises (for a fee, and using their position as "Vor" to instill the fear necessary resolve the dispute). KAZARIAN played those roles with the MTO, alternatively providing its members with assistance, collecting proceeds

from criminal schemes, and threatening individuals both within and without the organization who failed to pay him or respect him appropriately.

The Mirzoyan-Terdjanian Organization engaged in a wide variety of crime, but none more stunning than the operation of a sophisticated nationwide scheme to submit over $100 million in fraudulent bills to Medicare through a network of more than 100 bogus medical clinics located in at least 25 states. See Exhibit A (a map of the United States reflecting the approximate location of the medical clinics). Medicare fraud and indeed health care fraud is nothing unusual; there are numerous cases involving the inflation of health care bills by providing unnecessary medical treatments or through other techniques. But the MTO's Medicare fraud scheme did not bother with the time and expense of setting up actual clinics with actual doctors and patients: the MTO simply created bogus clinics out of thin air. The bogus clinics, or "phantom clinics" as they are referred to in the Indictment, existed only on paper. They had no doctors and treated no patients. Setting up such phantom clinics required the implementation of a number of sophisticated steps, which were repeated time and time again.

Theft of doctor identities. The first step in creating a phantom clinic was to steal the identity of a doctor – in particular, the doctor's date of birth, social security number, medical license number, and other identifying information. The Government's proof that the MTO engaged in such identity theft includes intercepted phone calls referring to doctor identities, intercepted mailings containing doctor identities, and of course interviews with dozens of doctors associated with the bogus clinics lined to the MTO.

Incorporation of a medical corporation and the application to Medicare. The second step in creating a phantom clinic was to file corporate forms in the stolen doctor's name, creating a

business entity such as a professional corporation (the precise form of the entity varied by state), and then filing an application for that professional corporation to bill Medicare. On many occasions, the listed "address" for the purported medical practice was actually the address of a Mailboxes Etc. or similar mail drop service, though in some cases the conspirators actually rented empty storefronts to give the scheme a venire, however thin, of legitimacy. The evidence gathered in the investigation supports this aspect of the MTO's operations as well. MIRZOYAN – a key leader in the Medicare fraud scheme – was intercepted on numerous occasions directing his associates to fill out Medicare applications, to pay leases on empty office space around the country, and to travel to dozens of P.O. boxes around the Los Angeles area to collect the mail for the various bogus clinics. Most devastatingly, MIRZOYAN and his associates – not knowing that the Government was intercepting phones – answered cellular phones that bore number that they had provided on bogus Medicare applications for the phantom clinics and pretended that they worked in actual doctors offices, coming up with various excuses as to why the actual doctor (whose name had been stolen) was not there.

Stealing patient identities. With a stolen's doctor's identity and a clinic licensed to bill Medicare in that doctor's name, the MTO then obtained stolen patient identities, the final ingredient needed to bill Medicare. Thousands of stolen patient identities have been used by the MTO and have been obtained from sources known and unknown throughout the United States, including almost 3,000 patient identities stolen from the Orange Regional Medical Center in Orange County, New York. The evidence of the MTO's involvement in patient identity theft is also clear from, among other things, intercepted calls relating to why particular patient names are no longer working and the need to acquire new ones.

Fraudulent billing. With these ingredients in place, the fraudulent billing machine could kick into high gear, with a single bogus clinic billing Medicare for hundreds of thousands of dollars for purported patient treatments over a short period. The conspirators did not always give careful consideration to the types of fraudulent billing, and the clinics linked to the MTO issued bills to Medicare that did not always make much sense. For example, the MTO used the identity of an ear, nose, and throat doctor to create a phantom clinic, and billed the Medicare program claiming the doctor performed pregnancy ultrasounds. The MTO also used the identity of a forensic pathologist – i.e., a doctor who performs autopsies – to create a phantom clinic, and billed the Medicare program for office visits. If there was any pattern to the billing, it was a preference for unusual and expensive tests. For example, the MTO used phantom clinics created with the stolen identities of doctors of widely varying practices and billed Medicare for sleep studies (expensive tests designed to identify sleep disorders), claiming variously that the studies were performed by a general surgeon, dermatologist, internist, neurological surgeon, otolarynologist (ear, nose, and throat doctor), and family practitioner. In another example, the MTO the used phantom clinics created with the stolen identities of doctors of widely varying practices and billed Medicare for electromyography testing of the anus, claiming variously that the tests were performed by a pathologist, internist, otolarynologist (ear, nose, and throat doctor), family practitioner, and psychiatrist.

Death and reincarnation of a phantom clinic. The phantom clinics did not last very long, with a shelf-life, well known to the MTO, of only a few months. Medicare would then detect the fraudulent billing and cease making further payments though not, in many cases, before providing the clinic with hundreds of thousands of dollars. But the end of a phantom clinic was

not unexpected to the MTO, and for each phantom clinic shut down, another was created. Numerous intercepted conversations between MIRZOYAN and his associates – many of whom essentially worked on the fraud full-time – relate to payment problems with one clinic but the good news of another clinic, in the name of another stolen doctor, being opened in some other part of the country and about to start billing. Wiretap interceptions, which include members of the MTO speaking of numerous phantom clinics by name or a recognizable number (like a bank account, or Medicare number), together with corroborating evidence from Medicare, from e-mail search warrants, from bank records, and other sources, have linked the MTO to at least approximately 118 different clinics that are allegedly "located" in 25 different states that billed Medicare for over $100 million and received over $35 million in actual Medicare payouts. An investigation into additional suspected fraudulent clinics is ongoing, and these numbers are likely to rise.

<u>Avoiding detection, and laundering the proceeds</u>. The members and associates of the MTO were able for a long time to avoid detection because none of its leaders or significant operators had their names on any documents. When opening a phantom clinic – aware that it would eventually be shut down – the MTO used nominees to open the bank accounts to receive the Medicare proceeds. In some cases, bank accounts were opened by individuals who intended to return to Armenia soon, meaning that there would be no one left behind if the bank or Medicare or law enforcement started inquiring about Medicare money sent into the account. In others cases, as shown on intercepted calls and bank account records, MIRZOYAN, YEPISKOPOSYAN and others directed their associates, including defendant BOYADZHYAN, to travel to various locations across the United States to open bank account in false names, and

presenting false identification documents to do so. The MTO also made every effort to transfer the money received into the phantom clinic accounts from Medicare to other bank accounts (often in the names of shell companies or opened with false identification documents), to still other bank accounts, and then to jewelry stores, check cashing businesses, and other locations where the money was converted to cash. Millions of dollars were converted into chips at a Las Vegas casino and then transferred among conspirators. Intercepted calls show the defendants engaging in these and other laundering activities, and also show the defendants, with cash in hand, sending the proceeds to Armenia, sometimes through cash smuggling and sometimes through informal networks.

While Medicare fraud, a clearly white collar offense, was the MTO's bread-and-butter, the Organization could not be mistaken for a business. It's leaders used threats of extreme violence to ensure that payments were appropriately shared and hierarchies protected. As discussed in more detail herein with respect to individual defendants, members of the MTO threatened at knife-point a New York fraudster aligned with another criminal ring when he failed to pay a debt to members of the Organization and threatened one of their own, defendant AMROYAN, when he failed to pay Vor KAZARIAN what he was owed for resolving a criminal dispute. Thus standing behind what is believed to be the largest Medicare fraud ever charged in a single indictment was a group of violent, sophisticated, organized and powerful criminals operating both throughout the United States and internationally.

B. The Indictment

On September 30, 2010, a grand jury in the Southern District of New York returned an indictment against the 28 defendants appearing on this caption, titled United States v. Kazarian

et al., 10 Cr. 895. That indictment was unsealed following arrests today. The Indictment charged the offenses described above, including conspiracies to commit Racketeering (Count One), Health Care Fraud (Count Two), Bank Fraud (Count Three), Money Laundering (Count Four), Identity Theft (Count Five), Credit Card Fraud (Count Six), and Immigration Fraud (Count Seven). Each of the above Detention Defendants has been charged with, among other offenses, participation in a racketeering conspiracy in violation of 18 U.S.C. § 1962(d) in connection with the operation of the Mirzoyan-Terdjanian Organization. All but two of the Detention Defendants (STEPANIAN and AMROYAN) have also been charged in the health care fraud conspiracy involving the $100 million scheme to defraud Medicare.

## II. Applicable Law

It is settled law in both the Second and Ninth Circuits that, while a magistrate court in the district of arrest presides over presentment and an initial bail determination, any bail or detention determination appealed by either the Government or defendant rests with the district judge assigned to the underlying indictment. See United States v. El-Edwy, 272 F.3d 149 9 (2d Cir. 2001); United States v. Evans, 62 F.3d 1233 (9th Cir. 1995). Accordingly, although defendants in this case will be arrested in both New York City and Los Angeles, this Memorandum cites primarily to Second Circuit authority, as that is the authority that will bind the district court assigned to the case.

The standards governing bail and detention are well settled in both the Second and Ninth Circuits. Title 18, United States Code, Section 3142(e) provides that if a judicial officer concludes after a hearing that "no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community,"

he or she shall order the defendant detained pending trial. 18 U.S.C. § 3142(e).

In assessing a defendant's risk of flight and the danger to the community presented by his release, Congress has directed courts to consider several factors: (1) "the nature and circumstances of the offense charged, including whether the offense is a crime of violence"; (2) "the weight of the evidence against the person"; (3) the "history and characteristics of the person"; and (4) the "nature and seriousness of the danger to any person or the community that would be posed by the person's release." 18 U.S.C. § 3142(g).

In seeking pre-trial detention, the Government bears the burden of showing by a preponderance of the evidence that the defendant poses a risk of flight or, by clear and convincing evidence, that the defendant poses a danger to the community, and that no condition or combination of conditions can address those risks. See 18 U.S.C. § 3142(f); see also United States v. Sabhnani, 493 F.3d 63, 75 (2d Cir. 2007); United States v. Mercedes, 254 F.3d 433, 436 (2d Cir. 2001); United States v. Friedman, 837 F.2d 48, 29 (2d Cir. 1988); United States v. Shakur, 817 F.2d 189, 195 (2d Cir. 1987); United States v. Motamedi, 767 F.2d 1403 (9th Cir. 1985).

Organized crime cases raise their own bail concerns. Courts in the Second Circuit routinely detain high-ranking members of organized crime based in part on their leadership roles in criminal enterprises that engage in acts of violence. See, e.g., United States v. Marino, ___ F. Supp 2d __, 2010 WL 3239141 (S.D.N.Y. August 7, 2010) (ordering detention of alleged boss of Gambino Family in part on the grounds that individuals in that position are likely to be involved in crimes of violence because of the inherent nature of the position); United States v. Daniel Leo, 06 Cr. 08 (LAK) (Genovese Family Acting Boss Daniel Leo detained based on non-racketeering

extortion charge); United States v. Gotti, 219 F. Supp.2d 296 (E.D.N.Y. 2002) (Gambino Family Acting Boss Peter Gotti detained as danger to the community), aff'd United States v. Ciccone, 312 F.3d 535 (2d Cir. 2002); United States v. DeFede, 7 F. Supp.2d 390, 393 (S.D.N.Y. 1998) (Luchese Family Acting Boss Joseph DeFede detained as danger to the community); United States v. Agnello, 101 F. Supp.2d 108, 116 (E.D.N.Y. 2000) (Gambino Family Soldier Carmine Agnello detained as danger to the community.

When the Government establishes that a defendant is a "a leader of an organized crime family, the Second Circuit has uniformly held that the defendant is dangerous because inherent in the leadership position is the supervision of criminal activity that cannot be curtailed by any condition or combination of conditions of release." United States v. Gotti, 219 F. Supp.2d 296, 299-300 (E.D.N.Y. 2002) (citations omitted). These decisions have been based not on the defendant's mere "association" with organized crime, but rather the evidence that members of organized crime routinely engage in acts of violence as a result of their position in a criminal enterprise. As Judge Kaplan held in DeFede, 7 F. Supp.2d at 392:

> [I]t is well established that persons who hold DeFede's status routinely engage in conduct that is a menace to public safety. The argument thus is based not on the status, but on the inference that a person in DeFede's position is quite likely to engage in dangerous conduct – just as one reasonably could infer that one holding the position of major league baseball pitcher is entirely likely to hurl a small white object in the direction of home plate.

Courts routinely detain organized crime leaders because such defendants have the authority and resources to continue criminal activities and to order and accomplish acts of violence against potential witnesses. See id. at 395.

Indeed, the Second Circuit has repeatedly rejected even "elaborate" bail packages for

dangerous defendants, including leaders of organized crime shown to be involved in violent criminal activities. See United States v. Ciccone, 312 F.3d 535 (2d Cir. 2002) (rejecting $1 million bail secured by real property); United States v. Orena, 986 F.2d 628, 630-633 (2d Cir. 1993) (rejecting $3 million bail secured with real property, in-home detention, restricted visitation and telephone calls, and electronic monitoring); United States v. Colombo, 777 F.2d 96, 100 (2d Cir. 1985) (rejecting $500,000 bail secured with real property).

The Second Circuit also has held that home detention and electronic monitoring are insufficient to protect the community against dangerous individuals:

> Home detention and electronic monitoring at best elaborately replicate a detention facility without the confidence of security such a facility instills. If the government does not provide staff to monitor compliance extensively, protection of the community would be left largely to the word of [the defendants] that [they] will obey the conditions.

United States v. Millan, 4 F.3d 1039, 1049 (2d Cir. 1993) (citations and internal quotations omitted). Nor is such monitoring sufficient to address a risk of flight. See also United States v. Marra, 165 F. Supp. 2d 478, 486 (W.D.N.Y. 2001) (finding "that electronic monitoring will not reasonably assure defendant's presence as required. At most, electronic monitoring would only reduce defendant's head start should she decide to flee.").

Detention is also appropriate, even for non-violent offenders, where strong overseas ties create a substantial risk of flight and in these case, too, electronic monitoring and even significant financial bonds are unable to guard against such risks. For example, in United States v. Sabhnani, 493 F.3d 63, 77 (2d Cir. 2007) the Court of Appeals found a defendant with strong ties overseas presented a serious risk of flight notwithstanding a substantial bond. As the Second Circuit noted:

> Defendants' risk of flight cannot be adequately addressed . . . simply through a high secured bond and restraining orders on financial accounts. A defendant facing a significant term of incarceration might well prefer to lose his financial assets rather than his freedom. Further, defendant[] might easily persuade some friend or family member to lend them the money necessary to finance flight from the United States. Neither such a modest indebtedness nor forfeiture of the multi-million dollar bail bonds is likely to have long-term negative consequences for [this] defendant[s].

Id.

## III. Analysis

### A. Generally

The above discussion of background facts and applicable law make clear that this is the sort of case, involving the type of individuals, where for a significant number of defendants there will be no condition or combination of conditions that can guard against danger to the community or risk of flight. All of the Detention Defendants are charged with belonging to a violent international criminal organization, and with engaging in a racketeering conspiracy with others in the organization. All of the Detention Defendants are Armenian immigrants or nationals, with strong ties to Armenia, a country with which there is no extradition treaty and from which extradition is simply not possible, and where many members of the organization have assets. And the crimes encompassed both within the RICO conspiracy and in separate substantive counts are extremely serious. Even for defendants with no criminal history who face no leadership enhancements, a conviction on the on the $100 Medicare fraud scheme (included in the RICO Count and separately charged in Count Two) alone results in a minimum post-trial Guidelines range of 262-237 months' imprisonment. On top of this, the Indictment alleges that the criminal organization has expertise in false identifications – stealing identities of doctors and patients and using other false identities to open bank accounts to receive criminal proceeds.

Such false identifications could also be provided to members of the organization who wish to flee abroad or simply remain in the United States but under a new identity. And perhaps to most significant factor supporting detention generally is the money: the defendants are alleged to have received more than $35 million from the Medicare fraud scheme alone, with the money being laundered through multiple channels, sent to Armenia and – in most cases – remaining unaccounted for. Given the tremendous amount of money received, even a high bond – millions of dollars – could be "worth paying" for significant figures in the MTO if that payment buys their freedom in a country where they may have many millions more hidden.

Thus this is a case where the Detention Defendants have strong incentive to flee, have strong ties to and wealth in a country where they can flee without fear of extradition, and are associated with a violent criminal organization with access to false identifications. For these defendants, for more particularized reasons set forth below, there is no condition or combination of conditions that can guaranteed the appearance of the defendants in Court.

**B. Particular Defendants**

1. <u>Armen Kazarian</u>

KAZARIAN – the Vor who profited from, protected, and extorted members of the MTO – should be detained as both a risk of flight and danger to the community. Indeed, ICE has filed a detainer on KAZARIAN (or will at his arrest) and expects to initiate administrative proceedings against him.

First, KAZARIAN poses a tremendous risk of flight. The Department of Justice has confirmed that KAZARIAN is the first known Vor ever charged with a racketeering offense in the United States, and the first known Vor arrested on any federal criminal charge since 1996.

KAZARIAN has strong ties overseas, to Armenia and Azerbaijan, and has lied to immigration officials about those ties. KAZARIAN resides in the United States based on his status as a refugee, a status he obtained through an asylum application granted in 1996 based on KAZARIAN's claim that he could not return to Azerbaijan or Armenia for fear of persecution. KAZARIAN's asylum application was plainly fraudulent. For example, KAZARIAN told the asylum officer who interviewed him that he had fled the region after witnessing his father doused by gasoline and burned to death, and further recounted an occasion where KAZARIAN was allegedly attacked while visiting his father's grave. In 2005, the FBI interviewed KAZARIAN in an unrelated matter and asked KAZARIAN about the fact that his father was alive and in fact living in Russia. KAZARIAN responded that he had been mistaken about his father's murder, notwithstanding his graphic account of it to the asylum officer.

KAZARIAN has traveled to Armenia and Azerbaijan, notwithstanding his alleged fear of persecution in those countries. For example, KAZARIAN recently took a three-month trip outside of the United States, leaving on April 8, 2010 and returning on July 5, 2010 on flights from Los Angeles to Paris. Upon his return, KAZARIAN reported on his arrival form to immigration that he had been in France. In fact, intercepted calls over phones used by co-conspirator MIRZOYAN show that KAZARIAN was in Armenia for much of the period.. See Exhibit B (call 17618, line 7400, in which AVETISYAN and TERDJANIAN discuss reaching out to KAZARIAN in Yerevan, Armenia) and Exhibit C (call 17623, line 7400, in which TERDJANIAN places an international call to KAZARIAN, who acknowledges being in Yerevan, Armenia). In fact, KAZARIAN has high-level contacts with Armenian officials. On September 23, 2010, KAZARIAN was intercepted speaking to an "Armen" in Armenia about his

recent appointment to the head of "6th Division Immigration" and an expected appointment soon to either "head of the Police" or "at least the head of the Criminal." Exhibit D (call 6498, line 2050). Approximately 25% percent of calls intercepted over a phone used by KAZARIAN, in fact, appear to be to or from individuals in Armenia, and many involve individuals in Armenia seeking to use KAZARIAN's status as a Vor to resolve disputes in Armenia, a fact that points to KAZARIAN's ties and influence in that country.

KAZARIAN also certainly has the means to flee. First, as set forth above (and further in this memorandum in the section dealing with BOYADZHYAN) the MTO has access to numerous false identification documents, which it has used to open bank accounts in the names of various people for the purpose of receiving Medicare proceeds, a crime which itself has involved the theft of numerous doctor and patient identities. Members of the MTO, including KAZARIAN, have considerable resources overseas. Indeed, KAZARIAN's wealth is not fully known and what is known is unaccounted for and unexplained. An analysis of a single account at Bank of America from approximately January 2008 through June 2010 showed the receipt of more than $112,475 in cash deposits. KAZARIAN drives a Rolls Royce Phantom, a car priced at over $350,000. Moreover KAZARIAN's role in the MTO and as a Vor generally is to receive cash proceeds in return for resolving disputes. For example, in connection with a $200,000 debt that KAZARIAN "erased" for an associate of AMROYAN, KAZARIAN demanded a fee of $100,000. It is apparent that payments made to KAZARIAN for such favors are highly unlikely to be paid through official means to traceable bank accounts or reported on tax returns.

Finally, with respect to risk of flight, KAZARIAN has a clear incentive to flee: he is

charged in a leadership position in connection with a racketeering conspiracy and is separately charged with participating in a $100 million Medicare fraud conspiracy. Given the risks of a lengthy prison sentence and KAZARIAN's strong international ties, no condition or combination of conditions is sufficient to guarantee his appearance in Court.

Separately, KAZARIAN is a clear danger to the community. Vors such as KAZARIAN have the power to extort criminal proceeds and resolve criminal disputes because they are feared, and KAZARIAN himself regularly uses the threat of violence to get what he wants, including – as will be particularly relevant in this case – by threatening those who are or may be cooperating with the Government.

The fact that KAZARIAN is a Vor will be established by witnesses who know him as such as well as intercepted calls where the term Vor (translated as "thief" in the transcript) is used. For example, in call 5441, line 2050 (Exhibit E), an associate of KAZARIAN's told KAZARIAN that he had told a third party that "beside the fact we [he and KAZARIAN} are thieves, we are brothers," which KAZARIAN did not correct or dispute. In another example (Exhibit F, call 5926, line 2050), a man named "Hakob" calling from Armenia spoke of a dispute with a person and his need for KAZARIAN to assist in resolving it, commenting to KAZARIAN "I will hit him in the face in your presence, because only a bitch lies to a thief." KAZARIAN did not dispute that he is a Vor, and said only "Are you crazy man? First, how are you going to hit him in my presence? And second . . . second, if I wanted to hit him I would hit him."

But there is more than KAZARIAN's position as Vor to consider in evaluating his danger. There are specific examples of extortion and threats. KAZARIAN has been repeatedly intercepted threatening those who have failed to pay him or show him proper respect. For

example:

- On July 21, 2010, KAZARIAN spoke to AVETISYAN (Exhibit G, call 4123, line 5353). The call followed a number of earlier calls relating to an "Alik" who had failed to show KAZARIAN proper respect by calling KAZARIAN when drunk. KAZARIAN told AVETISYAN to "find that son of a bitch, Alik that prick. His mother can blow me." KAZARIAN instructed AVETISYAN to "Tell him to come, no, he can blow me, I am going to kick his ass. Tell Gago, too. Say 'If any of you comes with him, you can all blow me." AVETISYAN volunteered that he would "fuck him [Alik] up the ass too, that son of a bitch." AVETISYAN later called Alik to direct him to meet KAZARIAN, and to meet him alone.

- On September 17, 2010, KAZARIAN spoke to "Sashko," who called KAZARIAN from an international phone number (Exhibit H, call 5817, line 2050). "Sashko" greeted KAZARIAN with "good morning dear" to which KAZARIAN responded "Man, go away, eat my spunk man, suck my dick." When Sashko asked "why," KAZARIAN responded to Sahsko with anger: "Man go away, you should suck my dick. What do you mean 'why,' man? Fuck your whore mouth. What do you mean 'why?'" Sahsko could only respond "my business was so bad." That Sahsko would refer to his lack of business as an explanation for why he had angered KAZARIAN strongly suggests that Sashko had not made payments to KAZARIAN.

- On September 30, 2010 KAZARIAN spoke to "Davo," who called from an Armenian number(call Exhibit I, call 7070, line 2050) and reported that an unspecified person had come without a car and that Davo had cursed him for failing to produce it, and that Davo would eventually catch the man with the car. KAZARIAN responded "He must get some beating. If not, then he is going to get a real beating." Davo responded "he got slapped a couple of times," to which KAZARIAN replied "Yeah-yeah. That's not enough, no that is not enough." Davo concurred .that he would "figure out what it is, and at the worst case really beat him up."

KAZARIAN also extorted another member of the MTO – AMROYAN – who failed to pay KAZARIAN a debt. In December 2006 KAZARIAN traveled to New York City at AMROYAN's request to assist an associate of AMROYAN's who needed the backing of a "Vor" like KAZARIAN to get out of a $200,000 debt that the associate owed to a criminal overseas. KAZARIAN called another Vor (who represented the overseas criminal) and the resolution was that the debt of AMROYAN's associate would be forgiven. For this "favor,"

KAZARIAN demanded a $100,000 fee from either the associate or AMROYAN himself. When neither paid, KAZARIAN went after AMROYAN for the money, causing his ostracization from others members of the MTO. In an intercepted call on July 25, 2010 (Exhibit J, call 4403, line 5353), STEPANIAN informed AVETISYAN that AMROYAN had bought a "yacht" notwithstanding his debt to KAZARIAN, and discussed how KAZARIAN was likely to react. Shortly after, AVETISYAN placed a call to KAZARIAN (Exhibit K, call 4406, line 5353) to inform him of the news. KAZARIAN directed AVETISYAN to "take it [the yacht] out of his hands."[3] KAZARIAN and his associates, in fact, often uses the phrase "take it out of his hands" when discussing acts of extortion. See Exhibit M (call 6269, line 2050, in which KAZARIAN directs "Davo" to "take the car out of his hands.").

2. Aleksandr Avetisyan

AVETISYAN should also be detained as both a risk of flight and danger to the community. As the preceding section on KAZARIAN demonstrates, AVETISYAN played an important role in the RICO conspiracy as a close associate of Vor KAZARIAN, and regularly communicated with KAZARIAN on issues relating to racketeering. AVETISYAN is also charged as a participant in the $100 million Medicare fraud based in part on his recent efforts to

---

[3] On top of this, there is some evidence that those working with KAZARIAN have weapons, and use them. In an intercepted call on September 22, 2010 (call 6305, 2050 line, exhibit L), an individual ("MP") told KAZARIAN "You remember that thing that, I don't know if it is a favor or disfavor. You remember when my father-in-law did . . . You remember? I did one . . . Should I keep it or throw it away?" MP continued "Bro, I did something small for you. I was thinking whether I should throw it away or keep it." KAZARIAN responded "let it stay." MP said "Yeah?" And KAZARIAN responded "Yeah where?" MP said "I will take it there and keep it because I don't want to keep in on me." The call clearly refers to some item MP used to do a "something small" for KAZARIAN and is nervous about keeping, and may well refer to a weapon.

open a pharmacy that will fraudulently bill Medicare for prescriptions (indeed, AVETISYAN and KAZARIAN were together surveilled at this pharmacy).

AVETISYAN's full biographical information, including his immigration status, is at present unknown, in part because AVETISYAN has simultaneously had a California Driver's License in both his name and the name "Vladimir Arushanyan" as confirmed by the Glendale Police Department. This use of multiple identities and lack of information regarding the true identity of the defendant itself poses a risk of flight. What is known is that AVETISYAN, who speaks Armenian fluently on intercepted calls, clearly has ties to Armenia. A number of calls intercepted over a phone AVETISYAN uses are to individuals in Armenia and/or show AVETISYAN has ties there. For example, in one call (Exhibit N, call 5991, line 5353) AVETISYAN discusses sending bail money to a jailed associate in Armenia. These foreign ties, questionable identity, and the fact that AVETISYAN is charged in serious offenses create a risk of flight that bail cannot address.

AVETISYAN is also a severe danger to the community, and many of the calls referenced in the proceeding section concerning KAZARIAN and relating to threats and extortion involve AVETISYAN as a participant in the schemes (e.g., Exhibits G, J and K). AVETISYAN has also been intercepted in several other conversations threatening to kill criminal associates who have failed him. For example, on July 6, 2010 AVETISYAN spoke to an individual (Exhibit O, call 3154, line 5353) about an "Artoym" who had "lost" the "merchandise." Referring to Artoym, AVETISYAN vowed to the individual "I am going to kill you this one, dude!" and then, shortly after (Exhibit P, call 3163, line 5353) AVETISYAN called someone who knew Artoym to berate him about the delay in handing off the "merchandise." AVETISYAN told the caller to tell

Artoym "Dude, son of bitches like you, I put in a meat grinder! You son of a whore! Your wife and your kid [inaudible], you dude!"

3. Davit Mirzoyan

MIRZOYAN should be detained because, as one of the leaders of the MTO – and the key identified leader of the scheme to defraud Medicare – no condition or combination of conditions can guaranteed his appearance in court.

As an initial matter, MIRZOYAN is an Armenian national with strong ties to Armenia, with property and business interests in Armenia, with criminal assets in Armenia (laundered Medicare fraud proceeds), and who – even before these charges were filed – has had discussions with associates about simply leaving the United States for Armenia. Indeed, the evidence against MIRZOYAN in connection with the Medicare fraud scheme is stronger than it is against any other defendant. Over the course of several months of wiretaps interceptions on a telephone used by MIRZOYAN, MIRZOYAN was repeatedly intercepted directing individuals to open up bogus Medicare clinics, speaking about billing for many of the bogus clinics, identifying them by name, collecting mail from drop boxes around Los Angeles for the clinics, and laundering funds received from the crimes.

MIRZOYAN's ties to Armenia are substantially supported by intercepted calls and other evidence. For example, MIRZOYAN recently built an 800 square meter home in Yerevan (Exhibit Q, call 5252, line 0201) and MIRZOYAN owns a café in Yerevan (Exhibit R, call 15438, line 0201). And MIRZOYAN has been intercepted on multiple occasions discussing the transfer of funds to Armenia. For example, on April 23, 2010, during an intercepted call (Exhibit S, call 17124, line 0201), DAVIT MIRZOYAN instructed his wife, ANNA

TERMARTIROSYAN, to "open that bag" "downstairs" and to "separate" and "split" what is in there in order to "separate five thousand from there." TERMARTIROSYAN reported that she "separated them." MIRZOYAN said that "that is four thousand" and then told Termartirosyan to "count one thousand dollars from one and combine it together." MIRZOYAN added that "Samo will give you another twenty" and that "Pogos will come and take it." A few minutes later, MIRZOYAN called co-defendant SATAMYAN (Exhibit T, call 17126, line 0201) and told him "I put $25,000 at home for you dear. You can go get it." SATAMYAN was then stopped at the airport on his outbound flight and found to be in possession of approximately $9,800 in cash and a check in an amount in excess of $20,000. Based on this, it appears that SATAMYAN collected the cash, arranged for some of it to be converted to a check (to avoid drawing undue scrutiny at the airport), and then left the country with the funds.

MIRZOYAN's Medicare fraud business became less profitable in 2010, partly the result of law enforcement efforts to identify and stop it, leading MIRZOYAN to comment to various associates that they should go to Armenia. For example, in an intercepted call on June 11, 2010 (Exhibit U, call 20046, line 0201) an associate told MIRZOYAN "do something so we can buy a house and stuff in Yerevan" to which MIRZOYAN laughed and responded "so we have a place go, right?" In another call (Exhibit V, call 16009, line 0201), MIRZOYAN spoke to a caller with an Armenian number who asked MIRZOYAN if there was "work" in the United States. MIRZOYAN responded "Yeah dear. We are still here because there is some . . . Otherwise, we will leave it and come there." If MIRZOYAN was considering relocating to Armenia while he was operating a fraud scheme earning millions, he would certainly be considering doing so now that he has been indicted for running it and facing the prospect of what is likely decades – and

possibly life – in prison.

4. Yepiskoposyan, Baghoumian and Boyadzhyan

YEPISKOPOSYAN, BAGHOUMIAN and BOYADZHYAN are analyzed together because the argument for detention is similar: all three played key roles in the MTO, particularly in the Medicare fraud conspiracy, and all three have substantial ties abroad, creating a risk of flight that cannot be addressed by bail. Additionally, YEPISKOPOSYAN and BAGHOUMIAN also present a danger to the community.

YEPISKOPOSYAN and BAGHOUMIAN were two of MIRZOYAN's principal partners in operating the health care fraud scheme. The three men spoke on a regular, often-many-times-a-day, basis about the operation of the Medicare fraud scheme, discussing new clinics being opened and the status of funds expected from Medicare. BAGHOUMIAN also played a key role in monitoring the flow of fraudulent funds from the clinics, and reported to MIRZOYAN on the status of particular accounts regularly. BAGHOUMIAN also assisted MIRZOYAN in obtaining new "patients" – i.e. stolen identities – to use to bill the Medicare clinics. For example, in an intercepted call on April 6, 2010 (Exhibit W, call 16223, line 0201), MIRZOYAN asked BAGHOUMIAN if they should "change the customers," telling BAGHOUMIAN that "they gave me about 300 the other day." BAGHOUMIAN responded "Then bring those, I will drop them in." MIRZOYAN commented that "there are no addresses for those" and when BAGHOUMIAN interjected "Oh shoot" MIRZOYAN asked "what will happen if we put down random addresses?" BAGHOUMIAN explained the "address has to match to the first and last name." BAGHOUMIAN also assisted the money laundering operations of the MTO and has received hundreds of thousands of laundered funds over the past two years, including payments

from a Las Vegas casino where the conspirators exchanged money through chips, and from a gold dealer.

YEPISKOPOSYAN assisted MIRZOYAN in numerous aspects of the scheme including in monitoring the doings of VARTAN BOYADZHYAN. BOYADZHYAN's key role was assuming identities of others ("Levon Papikan," "Ararat Bedroussian") and opening bank accounts for the fraudulent medical clinics to received Medicare proceeds. Numerous intercepted calls support this. For example, on December 22, 2009 ( Exhibit X, call 7069, line 0201) BAGHOUMIAN called MIRZOYAN to tell him that he was now being called "Levon" and MIRZOYAN inquired about the false identification document, wondering "how it was made? Was it ok, or not?" Subsequent calls, corroborated by travel records and bank records, show BOYADZHYAN flying around the country at the direction of MIRZOYAN and YEPISKOPOSYAN and opening bank accounts as "Levon Papikan" for the clinics and then, later, doing the same under the name Ararat Bedroussian. YEPISKOPOSYAN has also been intercepted in incriminating calls with BOYADZHYAN, including the following a series of back-to-back calls on August 11, 2010 (Exhibit Y, calls 6967-6969, 6972, line 0201) in which YEPISKOPOSYAN consulted with BOYADZHYAN and manufacturer of a false identification for BOYADZHYAN. In addition to demonstrating the culpability of the defendants in the charged offenses, these calls show that the MTO – and MIRZOYAN, YEPISKOPOSYAN, and BOYADZHYAN in particular – have access to the sort of false identification documents that would make remaining a fugitive an easier prospect.

The prime role YEPISKOPOSYAN, BAGHOUMIAN and BOYADZHYAN play in the scheme creates a particular flight risk given that all three of these Armenian speakers have

international ties. BAGHOUMIAN also has ties to Iran and in one intercepted call with MIRZOYAN relating to clinic patients (Exhibit Z, call 6278, line 0201) BAGHOUMIAN tells MIRZOYAN about a planned trip to Iran (which he does not ultimately take). YEPISKOPOSYAN, like MIRZOYAN, has been intercepted making comments about perhaps remaining in Armenia, where he owns a café (Exhibit AA call 7901, line 9909). For example, on July 7, 2010 (Exhibit BB, call 21816, line 0201) YEPISKOPOSYAN, calling from Armenia, spoke to POGOSIAN (who laundered money for the MTO). YEPISKOPOSYAN talked about delaying his return to the United States, telling POGOSIAN for "20,000 a month, my dick, I won't come at all . . . I will fuck friendship, America." While YEPISKOPOSYAN stated in the call that he is "joking," he likely would approach the matter much more seriously facing charges in a $100 million fraud scheme and a Guidelines sentence of decades in prison. YEPISKOPOSYAN also has strong ties to Armenian officials. On July 13, 2010 YEPISKOPOSYAN was intercepted speaking to co-defendant GOURGEN MIRIMANIAN, who asked YEPISKOPOSYAN to help a friend that U.S. immigration services were trying to deport. MIRIMANIAN asked YEPISKOPOSYAN to call "Yerevan" to "warn . . . so if it comes to that Yerevan will not accept him." YEPISKOPOSYAN agreed he will call "whoever it is . . . the head of the department . . . whoever is the . . . I am going to call the exact person, who does the denial . . . . I am going to ensure it." (Exhibit GG, Call 4212, Line 9909). In other words, MIRIMANIAN and YEPISKOPOSYAN were trying to arrange for Armenia to refuse to accept a deportee so that the United States would be unable to remove him, which points both to their ties to Armenia and YEPISKOPOSYAN's influence in that country which would likely make it a safe haven for him if he did flee.

Finally, of the above defendants, YEPISKOPOSYAN and BAGHOUMIAM also present a danger to the community. BAGHOUMIAN is a convicted of a sexual battery in 1999 against a person who appeared to be under 14 years of age, a crime for which he received a sentence of 3 days incarceration and 3 years' probation. Notwithstanding this conviction, BAGHOUMIAN was in the last year seen in possession of a firearm by a reliable cooperating witness. As for YEPISKOPOSYAN, in an intercepted call on July 22, 2010, (Exhibit CC, call 23160, 0201 line) YEPISKOPOSYAN spoke to co-defendant ARMAN GRIGORIAN and told him that if another individual"doesn't send the money by 11:00 in the morning . . . I swear on my child's life I am going to hurt him . . . I will do something to him, I swear, or I am a son of a bitch. I only ask that you forward those words to him. Say, if the money is not deposited until 11:00 in the morning, Artur swore such things." This call demonstrates that even in connection with non-violent offenses, like a scheme to defraud Medicare and launder funds, members of the MTO used threats of violence – backed, ultimately in some cases by KAZARIAN – to ensure that the illegal venture ran smoothly, and that proceeds were divided properly.

5. Robert Terdjanian

TERDJANIAN – one of the leaders of the MTO, and the only defendant charged in every count of the Indictment – should be detained both as a risk of flight and danger to the community. He is also charged in a second indictment, also unsealed today, relating to a multi-million dollar conspiracy to defraud no-fault health benefit programs offered by automobile insurance companies.

TERDJANIAN has strong ties to Armenia and has been intercepted on multiple occasions discussing the need to have foreign travel documents at the ready. For example, on

March 30, 2010 (Exhibit DD, call 13839, 7400 line) TERDJANIAN asked an unidentified male about the status of a passport that he was trying to obtain. On April 14, 2010 (Exhibit EE, call 15816, 7400 Line) TERDJANIAN and his father, co-defendant RAFIK TERDJANIAN, had a conversation about a passport in which RAFIK TERDJANIAN stated the “date for staying in foreign countries is until 2015; passport expires in 2020.” ROBERT responded that this information was “very good.” RAFIK then continued that “so you can go tomorrow, come back and get your green card in 6 months, 100%.” On May 3, 2010 (Exhibit FF, call 17115 , 7400 line), TERDJANIAN stated that “ if they don't give me my documents, of course, I have to get up and leave. What and I going to do here without documents?” If TERDJANIAN was considering leaving the United States simply if his documents were not in order, he certainly would consider leaving the United States when facing serious criminal charges.

TERDJANIAN has also used an alias “Oleg Kamarine” in the course of committing the offenses charged in the indictment, which demonstrates an access to fraudulent identities which would make leaving the United States (or hiding here with a different identity) more feasible. Specifically TERDJANIAN has used the “Kamarine” alias to launder hundreds of thousands of dollars from the Medicare fraud scheme. TERDJANIAN has used identification documents in the name of “Oleg Kamarine” to open up bank accounts to shield his own identity. TERDJANIAN has also used the name of “Levon Papikan” to commit financial frauds. Mail addressed to Kamarine and Papikan, as well as businesses incorporated in those names, from banks and credit card companies and other business correspondence was sent to TERDJANIAN's father, RAFIK TERDJANIAN, at an address in Brooklyn, New York.

TERDJANIAN also presents a danger to the community, both in terms of further

commission of fraud offenses and in terms of physical danger to those who cross his path. TERDJANIAN's criminal history dates back to 1995 when TERDJANIAN was convicted of Petit Larceny in Nassau County First District Court, and sentenced to a conditional discharge, coupled with 40 days' imprisonment and a $100 fine. While that case was pending, a bench warrant was issued for TERDJANIAN. On or about July 26, 1996, TERDJANIAN was convicted of possession of burglar tools in Kings County Criminal Court and sentenced to a term of three years' probation and 40 days' community service. On or about November 16, 1998, TERDJANIAN was convicted of burglary in the third degree in Kings County Supreme Court and sentenced to a term of five years' probation and a six month order of protection was imposed. On February 26, 1999, TERDJANIAN was convicted in Bergen County, New Jersey, Superior Court of shoplifting and sentenced to two years' probation. On April 23, 2002, a bench warrant was issued for TERDJANIAN, on which he was returned on June 3, 2003.
On or about April 5, 2004, TERDJANIAN was convicted of driving while intoxicated in Kings County Criminal Court and sentenced to a conditional discharge. Again, on May 20, 2004 a bench warrant was issued for TERDJANIAN, on which he was returned on August 24, 2005. On August 7, 2006, TERDJANIAN was convicted of reckless endangerment in Kings County Criminal Court and sentenced to a criminal discharge. In addition, TERDJANIAN has been convicted of federal firearms charges. On or about April 25, 2003, TERDJANIAN was sentenced to a term of 24 months' imprisonment.

This extensive and lengthy pattern of criminal activity demonstrates that TERDJANIAN presents a danger to the community (the routine bench warrants also amplify the risk of flight). In addition to these prior convictions, evidence gathered in the course of this investigation

demonstrates the violent and dangerous behavior in which TERDJANIAN continues to engage. For example, as set forth in the Indictment, TERDJANIAN, VAGAN STEPANIAN and others extorted a member of another criminal organization over a debt that individual owed to TERDJANIAN. On or about May 29, 2009, TERDJANIAN pulled a knife on the individual during a "sit down" over the debt at a Brighton Beach restaurant and threatened to disembowel the individual if the debt was not paid, a fact established through various sources including intercepted calls in which TERDJANIAN threatens this individual and FBI surveillance.

6. VAGAN STEPANIAN

STEPANIAN is a senior and well-respected member of the MTO, with strong ties to its leaders including TERDJANIAN, AVETISYAN and KAZARIAN. VAGAN STEPANIAN is charged in three counts: the RICO conspiracy, conspiracy to commit credit card fraud and conspiracy to commit immigration fraud. For each of those charges, STEPANIAN faces significant penalties, including a substantial prison term. These serious charges present a substantial risk of flight.

This risk of flight is amplified to the point where no conditions could address it because of STEPANIAN's immigration status. STEPANIAN, while in the United States legally, could be deported to Armenia, regardless of the outcome of this criminal case. STEPANIAN has every incentive to avoid that because he is currently wanted in Armenia for the crime of murder. A Red Notice has been issued from INTERPOL for STEPANIAN on charges of murder and attempted murder in Armenia. According to those records, on July 29, 1990, STEPANIAN caused a motor vehicle accident. A quarrel broke out between STEPANIAN and two men in the other car, and resulted in STEPANIAN being charged with killing one of the men and seriously

wounding the other. STEPANIAN has remained a fugitive on those charges for twenty years.

STEPANIAN's desire to avoid being deported to Armenia due to a murder charge also of course points to his danger to the community. STEPANIAN's violent behavior has continued in recent years in the United States. For example, as set forth in the Indictment, TERDJANIAN, STEPANIAN and others extorted a member of another criminal organization over a debt that individual owed to TERDJANIAN. On or about May 29, 2009 TERDJANIAN pulled a knife on the individual during a "sit down" over the debt at a Brighton Beach restaurant (STEPANIAN was at the sit-down supporting TERDJANIAN) and threatened to disembowel the individual if the debt was not paid. STEPANIAN, along with AVETISYAN and TERDJANIAN also plotted, including in intercepted calls (including Exhibit J), to forcefully take a yacht that AMROYAN had allegedly purchased despite his failure to repay a debt to KAZARIAN.

7. <u>VARUJAN AMROYAN</u>

AMROYAN, who is charged with participating in the RICO conspiracy and with a credit card fraud conspiracy, should be detained as a risk of flight. AMROYAN is a risk of flight no only because he has strong ties to Armenia and faces serious charges but because – in recent months – even other members of the MTO, including KAZARIAN, have been threatening AMROYAN over his failure to pay a debt. He therefore will face dual incentives to flee – avoiding punishment, and avoiding contact with leaders of a violent organization that now wish him harm.

AMROYAN's criminal record – and the fact that he committed the instant offenses while on probation – show a further disregard for the law that make him a poor flight risk. On November 22, 1994, AMROYAN was convicted in the United States District Court, District of

New Jersey, of making a false statement on a currency transaction report, and sentenced to a term of 33 months' imprisonment, and a $5,000 fine. On December 6, 1996, AMROYAN was convicted in the United States District Court, District of New Jersey, of conspiracy to defraud the United States, specifically excise tax evasion, for which he was sentenced to a term of seven months' imprisonment. Amroyan was also arrested (and convicted) in Deerfield, Illinois in 2007 in connection with the use of fraudulent credit cards. As a result, AMROYAN was on probation from November 15, 2007 through May 15, 2010, a time period which encompasses much of the conduct charged in the Indictment. AMROYAN's continued commission of various crimes while under the terms of probation demonstrates a total disregard for the law and obligations imposed upon him.

In addition, AMROYAN has used various aliases in connection with the crimes he has committed. AMROYAN has been found in possession of identification documents issued in the names of others. For example, when AMROYAN was arrested in 2007 in Deerfield, Illinois, he was found with a fraudulent driver's license which contained AMROYAN'S photograph, but another individual's name and address. He also was found with fraudulent credit cards, which could provide a resource if AMROYAN chose to flee. Thus, AMROYAN has used fraudulent identification documents and credit cards himself, has the ability to obtain such fraudulent identification documents.

**Conclusion**

For the reasons set forth above, the Government submits that KAZARIAN, AVETISYAN, MIRZOYAN, YEPISKOPOSYAN, BAGHOUMIAN, BOYADZHYAN, TERDJANIAN, STEPANIAN and AMROYAN should all be detained without bail.

Respectfully submitted,

PREET BHARARA
United States Attorney
Southern District of New York

By: __________/s/________________
Arlo Devlin-Brown
Jennifer Burns
Assistant United States Attorneys
(212) 637-2506 / 2315