UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

v.

ARMEN KAZARIAN et al.,

                    Defendants.

**MEMORANDUM
OPINION & ORDER**

10 Cr. 895 (PGG)

PAUL G. GARDEPHE, U.S.D.J.:

>        The Indictment in this case alleges that the twenty-eight named defendants were members of a racketeering organization that schemed to defraud Medicare of more than $100 million.  In addition to RICO violations, the Indictment charges, inter alia, that the defendants conspired to commit health care fraud, bank fraud, money laundering, and access device fraud.

>        Defendant Davit Mirzoyan has filed:

>    1.   motions to suppress evidence obtained over court-authorized wiretaps (Dkt. Nos. 333, 336, 339);

>    2.   motions to suppress evidence obtained through various physical searches; (Dkt. Nos. 342, 345, 348, 351, 354);

>    3.   a motion to dismiss Counts Two through Six of the Indictment as multiplicitous (Dkt. No. 379);

>    4.   a motion to dismiss the Indictment on the grounds that it does not provide sufficient notice (Dkt. No. 379);

>    5.   a motion for a bill of particulars (Dkt. No. 327); and

>    6.   a motion for severance based on alleged improper joinder of counts and parties (Dkt. No. 324).

>        The Court held a hearing on these motions on April 17, 2012 ("the April 17 hearing").  Having considered the parties' briefs, the oral argument at the April 17 hearing, and

post-hearing submissions, the Court concludes that Mirzoyan's pre-trial motions should be denied in their entirety. [1]

## DISCUSSION

## I.   MOTION TO SUPPRESS WIRETAP EVIDENCE

Mirzoyan argues that the wiretap evidence obtained through court-authorized wiretaps should be suppressed because (1) the judges issuing the wiretap orders lacked jurisdiction; (2) the Department of Justice official who approved the applications lacked the authority to do so; (3) the Government's wiretap applications were not supported by probable cause; (4) the Government's applications do not demonstrate the necessity for a wiretap; and (5) the Government failed to comply with statutory minimization requirements.

### A.   Applicable Law

#### 1.   Standing

An "aggrieved person" may seek to suppress communications intercepted by the Government.  See 18 U.S.C. 2518(10)(a).  Title III defines an "aggrieved person" as "a person who was a party to any intercepted wire, oral or electronic communication or a person against whom the interception was directed."  18 U.S.C. § 2510(11).  The Government does not dispute that Mirzoyan has standing to move to suppress the wiretap evidence.  (Gov't Br. at 12 (Dkt. No. 382))

#### 2.   Statutory Requirements for Authorizing Wiretap

In order to authorize the interception of oral communications under Title III, a court must determine that

---

[1]  All other defendants who filed pre-trial motions have since pleaded guilty.  Their motions will be denied as moot.

(a)  there is probable cause for belief that an individual is committing, has committed, or is about to commit a [crime enumerated in 18 U.S.C. § 2516];

(b)  there is probable cause for belief that particular communications concerning that offense will be obtained through such interception;

(c)  normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous; [and]

(d)  . . . there is probable cause for belief that the facilities from which, or the place where, the wire, oral, or electronic communications are to be intercepted are being used, or are about to be used, in connection with the commission of such offense. . . .

18 U.S.C. § 2518(3).

The statutory requirement that normal investigative techniques be addressed in wiretap applications "'is simply designed to assure that wiretapping is not resorted to in situations where traditional investigative techniques would suffice to expose the crime.'"  United States v. Serrano, 450 F.Supp.2d , 236 (S.D.N.Y. 2006) (quoting United States v. Kahn, 415 U.S. 143, 153 n.12 (1974).  The legislative history accompanying Section 2518 indicates that "normal investigative techniques includes,

for example, standard visual or aural surveillance techniques by law enforcement officers, general questioning or interrogation under an immunity grant, use of regular search warrants, and the infiltration of conspiratorial groups by undercover agents or informants.

S. Rep. No. 1097, 90th Cong., 2d Sess., reprinted in 1968 U.S.C.C.A.N. 2112, 2190.

Courts must take a "common sense approach" to the necessity requirement. United States v. Concepcion, 579 F.3d 214, 218 (2d Cir. 2009).  Although "generalized and conclusory statements that other investigative procedures would prove unsuccessful" do not suffice, "the Government is not required to exhaust all conceivable investigative techniques before resorting to electronic surveillance."  Id. (internal quotation marks omitted).  "'[T]he statute only requires that the agents inform the authorizing judicial officer of the nature and

progress of the investigation and of the difficulties inherent in the use of normal law enforcement methods.'"  Id.  (quoting United States v. Diaz, 176 F.3d 52, 111 (2d Cir. 1999)).  "[T]here is no requirement 'that any particular investigative procedures be exhausted before a wiretap may be authorized.'"  United States v. Miller, 116 F.3d 641, 663 (2d Cir. 1997) (quoting United States v. Young, 822 F.2d 1234, 1237 (2d Cir. 1987) (internal citations omitted).

This Circuit has noted that wiretapping "'is particularly appropriate when the telephone is routinely relied on to conduct the criminal enterprise under investigation.'"  United States v. Fleishman, No. 11 Cr. 32(JSR), 2011 WL 4000987, at *3 (S.D.N.Y. Aug. 31, 2011) (quoting  United States v. Steinberg, 525 F.2d 1126, 1131 (2d Cir. 1975) ("[T]he very scope of the operations described in the affidavit made it highly likely that numerous narcotics-related communications would take place in the future.").  Where there is a conspiracy at work, the need for a wiretap may be compelling:  "the clandestine nature of alleged conspiracies makes them relatively less susceptible to normal investigative techniques."  United States v. Feola, 651 F. Supp. 1068, 1105 (S.D.N.Y. 1987), aff'd, 875 F.2d 857 (2d Cir. 1989).

Defendants bear the burden of proving that wiretap applications were in some manner deficient.  United States v. Fea, No. 10 Cr. 708(PKC), 2011 WL 1346981, at *4 (S.D.N.Y. Apr. 5, 2011) (citing United States v. Magaddino, 496 F.2d 455, 459-60 (2d Cir. 1974) ("the 'burden is, of course, on the accused in the first instance to prove to the trial court's satisfaction that wire-tapping was unlawfully employed'").

**B.**   **Analysis**

**1.**   **Jurisdiction**

Mirzoyan argues that the wiretap evidence must be suppressed because the communications the Government sought authorization to intercept were not made in the

Southern District of New York.  According to Mirzoyan, Southern District judges thus lacked the jurisdiction to issue the wiretap orders.  Mirzoyan contends that "Congress intended . . . jurisdiction for issuance of an interception order [to] be limited to phones located within the issuing court's jurisdiction at the time of the application. . . ."  (Def. Br. (Dkt. No. 361) at 12; Def. Br. (Dkt. No. 361) 8-14).

Under Section 2518(3), a "judge may enter an ex parte order . . . authorizing or approving interception of wire, oral, or electronic communications within the territorial jurisdiction of the court in which the judge is sitting (and outside that jurisdiction but within the U.S. in the case of a mobile interception device authorized by a Federal court within such jurisdiction)."  18 U.S.C. § 2518(3).  "Intercept" is defined as "the aural or other acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device."  18 U.S.C. § 2510(4).

In interpreting this statutory definition, the Second Circuit has held that "a communication is intercepted not only where the tapped telephone is located, but also where contents of the redirected communication are first to be heard."  United States v. Rodriguez, 968 F.2d 130, 136 (2d Cir. 1992).  Accordingly, a "federal court sitting in the jurisdiction in which the to-be-tapped telephone is located would have the authority, under § 2518(3), to authorize a wiretap[on that telephone]," and a district judge sitting in the jurisdiction where "the redirected contents are first heard" likewise has authority to authorize the interception of those communications.  Rodriguez, 968 F.2d at 136; United States v. Bernardino, No. 07 Cr. 151(PKC), 2007 WL 4462176, at *3 (S.D.N.Y. Dec. 17, 2007).

Here, district judges sitting in the Southern District of New York authorized the wiretaps at issue.  (Gov't Br. at 2 n.3, 4 n.6, 5 n.7 and 10 n.9)  Each wiretap application

submitted by the Government represented to the issuing judge that intercepted communications would in all instances be first heard by agents located in this District.  See, e.g., 9/2/09 Terdjanian Application at 022462; 11/3/09 Mirzoyan Application at 020298; 6/28/10 Yepiskopyan Application at 022912.  There is no allegation that the Government varied from this representation in practice.  Therefore, under Rodriguez, the jurisdictional requirement of Section 2518(3) is satisfied because the intercepted calls were "first heard" in the Southern District of New York.

Mirzoyan argues that Rodriguez can be distinguished because here there are no "factual underpinnings" connecting the wiretaps applications to New York.  (Def. Br. (Dkt. No. 274) at 19)  Mirzoyan's attempts to distinguish Rodriguez are unavailing.  There is no indication in that case that its holding depends on such "factual underpinnings."  See Rodriguez, 968 F.2d at 136.  Instead, the Rodriguez court's holding concerning the meaning of "intercept" turns on its analysis of the text, legislative history, and policy considerations underlying 18 U.S.C § 2510(4) and Title III more generally.  See id. at 135-36.  The Rodriguez court anticipated cases in which the Government would "seek [as here] to tap telephones in more than one jurisdiction and to monitor them in a single jurisdiction," and determined that "there are sound policy reasons for permitting a court in the jurisdiction where all of the captured conversations are to be heard to grant the authorization."  Id. at 136.

Mirzoyan has cited no case that calls the Rodriguez holding into question.  Indeed, courts in this Circuit have repeatedly relied on Rodriguez in cases indistinguishable from the instant case.  See, e.g., United States v. Goodwin, 131 F.3d 132, at *2 (2d Cir. 1997) (summary order) ("Telephone communications are deemed intercepted at two places:  where the tapped telephone is located and where the communications are overheard. . . . The FBI agents

overheard the conversations while in the Northern District of Georgia, and the calls were therefore intercepted within that jurisdiction for purposes of 18 U.S.C. § 2518(3).”); United States v. Rodriguez, No. 08 CR 1311(RPP), 2009 WL 2569116, at *6 (S.D.N.Y. Aug. 20, 2009) (“Defendants do not challenge the assertion that the calls were routed to an Arizona location where they were intercepted and recorded.  Under existing case law, this is sufficient to demonstrate that the calls were ‘intercepted’ within Arizona, thereby giving the Arizona court jurisdiction to issue the wiretap.”); United States v. Bernardino, No. 07 Cr. 151(PKC), 2007 WL 4462176, at *3 (S.D.N.Y. Dec. 17, 2007) (court where the calls are first listened to and recorded has jurisdiction to authorize their interception); United States v. Gotti, 42 F.Supp.2d 252, 286 (S.D.N.Y.1999) (same).[2]

United States v. Archer, 486 F.2d 670 (2d Cir. 1973) and its progeny, cited by Mirzoyan, are not to the contrary.  In Archer, the Government attempted to create federal jurisdiction over a local crime by initiating interstate telephone calls with the defendants.  Here, the interstate nature of the charged conspiracies is obvious, as is the utilization of instruments of interstate commerce in furtherance of the alleged conspiracies.  Accordingly, Archer is inapposite.

Because the intercepted conversations were to be, and were, first listened to in this District, judges sitting in this District were authorized to issue the wiretap orders at issue.

---

[2]  Courts in other jurisdictions have followed Rodriguez.  See, e.g., United States v. Luong, 471 F.3d 1107, 1109 (9th Cir. 2006); United States v. Ramirez, 112 F.3d 849, 852 (7th Cir. 1997); United States v. Denman, 100 F.3d 399, 402-03 (5th Cir. 1996); United States v. Tavarez, 40 F.3d 1136, 1137-38 (10th Cir. 1994) (applying Rodriguez to a “similarly worded” Oklahoma statute); United States v. Giampa, 904 F. Supp. 235, 278 (D.N.J. 1995).

2.    **Delegation of Authority**

Mirzoyan argues that Criminal Division Deputy Assistant Attorneys General who approved the Government's wiretap applications lacked the authority to do so under 18 U.S.C. § 2516(1) because they were not "specially designated" by name to do so by the Attorney General. (Def. Br. (Dkt. No. 338) at 10; Def. Br. (Dkt. No. 341) at 17-18; Def. Br. (Dkt. No. 335) at 17-19)

Under 18 U.S.C. § 2516(1), the

Attorney General, Deputy Attorney General, Associate Attorney General, or any Assistant Attorney General, any acting Assistant Attorney General, <u>or any Deputy Assistant Attorney General or acting Deputy Assistant Attorney General in the Criminal Division or National Security Division specially designated by the Attorney General</u>, may authorize an application to a Federal judge of competent jurisdiction for . . . an order authorizing or approving the interception of wire or oral communications. . . .

18 U.S.C. § 2516(1) (emphasis added).

Here, each wiretap application cited Attorney General Order No. 3055-2009, in which the Attorney General authorized "any Deputy Assistant Attorney General of the Criminal Division" to approve Title III wiretap applications.   (See, e.g., 4/21/10 Mirzoyan Application, Ex. A; 6/28/10 Yepiskoposyan Application, Ex. A)  In accordance with that order, every wiretap application in this investigation was approved by a Deputy Assistant Attorney General of the Criminal Division.

The Second Circuit has rejected the argument that Section 2516(1) requires the Attorney General to "specially designate" a Deputy Assistant Attorney General by name.  In <u>United States v. Nanfro</u>, a Deputy Assistant Attorney General approved a wiretap application pursuant to Attorney General Order No. 1348-89, which states that "'any Deputy Assistant Attorney General of the Criminal Division'" may authorize a Title III wiretap application.

Nanfro, 64 F.3d 98, 100 (2d Cir. 1995) (quoting Attorney General Order No. 1348-89).  The

Second Circuit held that this order authorizes Criminal Division Deputy Assistant Attorneys

General to approve Title III wiretap applications, even though the order does not list Deputy

Assistant Attorneys General by name.  Id. at 99-100.  The Court reasoned that, "had Congress

intended that Deputy Assistant Attorneys General be designated by name rather than by position,

it would have written that requirement into the text."  Id. at 100 (citing United States v. Citro,

938 F.2d 1431, 1435-36 (1st Cir. 1991) ("Section 2516(1) does not state that the Attorney

General must designate officials by name.  Identification by position is entirely consistent with

the legislative history, which indicates that the purpose of the statute was to ensure that intrusive

electronic eavesdropping be authorized only by a limited group of responsible federal officials.

The statute requires that each of the officials be able to trace his or her explicit authority, by

designation, to the Attorney General, an official who, by virtue of presidential appointment and

Senate confirmation, is publicly responsible and subject to the political process.")).  Accordingly,

under Section 2516(1), it is sufficient for the Attorney General to designate a class of individuals

who are authorized to approve wiretap applications; the Attorney General need not list those

individuals by name.  See also United States v. Rodriguez, 2009 WL 2569116, at *8 (S.D.N.Y.

2009).  Accordingly, the Deputy Assistant Attorneys General who approved the wiretap

applications here were fully authorized to do so.

### 3.    Probable Cause

Mirzoyan also contends that certain of the Government's wiretap applications

were not supported by sufficient probable cause.[3]

---

[3]  Mirzoyan does not challenge any wiretap order issued prior to September 2009.  Although the
Government obtained incriminating evidence against Mirzoyan in the earlier wiretaps (see, e.g.,

**(a)**     **Legal Standard**

"Probable cause to support a wiretap order exists when the facts made known to the issuing court are sufficient to warrant a prudent man [or woman] in believing that evidence of a crime could be obtained through the use of electronic surveillance." Fea, 2011 WL 1346981, at *4 (citing United States v. Ruggiero, 824 F. Supp. 379, 398 (S.D.N.Y.1993).   In making this determination, courts apply a "totality of the circumstances" analysis. Id. (citing Illinois v. Gates, 462 U.S. 213, 238 (1983)).  Agents may "draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that 'might well elude the untrained person.'" United States v. Arvizu, 534 U.S. 266, 273 (2002) (quoting United States v. Cortez, 449 U.S. 411, 418 (1981)).

The "task of the issuing [judge] is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him . . . there is a fair probability that . . . evidence of a crime will be found. . . ." Gates, 462 U.S. at 238. "Probable cause is not a particularly demanding standard.  'It is clear that only the probability, and not the prima facie showing, of criminal activity is the standard of probable cause.'" United States v. Scala, 388 F.Supp.2d 396, 401 (S.D.N.Y. 2005) (quoting Gates, 462 U.S. at 235 (internal quotation marks omitted)).

While a wiretap application must include "the identity of the person, if known, committing the offense and whose communications are to be intercepted," 18 U.S.C. § 2518(1)(b)(iv), the focus of the probable cause determination is on the telephone to be tapped. United States v. Kahn, 415 U.S. 143, 157 (1974) ("The clear implication of [Section 2518(1)(b)(iv)] is that when there is probable cause to believe that a particular telephone is being

---

9/2/09 Koch Aff. at 022564-65; 7/30/09 Koch Aff. at 037125, 037129), Mirzoyan does not seek to suppress this evidence.

used to commit an offense but no particular person is identifiable, a wire interception order may, nevertheless, properly issue under the statute.  It necessarily follows that Congress could not have intended that the authority to intercept must be limited to those conversations between a party named in the order and others, since at least in some cases, the order might not name any specific party at all.")  "Individuals are not necessarily the focus of the wiretap statute and the Fourth Amendment.  Instead, the focus is whether criminal conversations will occur on specific phones."  United States v. Vasconcellos, 658 F.Supp.2d 366, 385 (N.D.N.Y. 2009).

An issuing court's determination of probable cause is entitled to "substantial deference, and any doubt about the existence of probable cause must be resolved in favor of upholding the issuing court's order."  United States v. Solomonyan, 451 F.Supp.2d 626, 635-36 (S.D.N.Y. 2006) (quoting United States v. Wagner, 989 F.2d 69, 72 (2d Cir. 1993) and citing Gates, 462 U.S. at 237 n.10); see also United States v. Segura, No. 3:99CR85 (EBB), 3:99CR113 (EBB). 2001 WL 286850, at *4 (D. Conn. Feb. 27, 2001) ("A court's decision that there is probable cause to issue an order authorizing electronic surveillance is entitled to substantial deference by reviewing courts."); United States v. Labate, No. S100CR.632(WHP), 2001 WL 533714, at *16 (S.D.N.Y. May 18, 2001) (same).

In considering a motion to suppress wiretap evidence, a court does not conduct a de novo review; instead, the question to be addressed is whether the issuing court had a "substantial basis" for concluding that probable cause existed.  See United States v. Biaggi, 853 F.2d 89, 95 (2d Cir. 1988) ("a reviewing court will defer to the issuing court's determination that there was probable cause 'as long as there existed a substantial basis for a magistrate or judge to conclude that a search would uncover evidence of wrong-doing'" (quoting United States v. Nersesian, 824 F.2d 1294, 1306 (2d Cir. 1987)); United States v. Bellomo, 954 F.Supp. 630, 636

(S.D.N.Y. 1997); United States v. Orena, 883 F.Supp. 849, 860 (E.D.N.Y. 1995).  It is

defendant's burden to demonstrate that probable cause was lacking.  Fea, 2011 WL 1346981, at

*4 (citing Magiddino, 496 F.2d at 459-60 ("the 'burden is, of course, on the accused in the first

instance to prove to the trial court's satisfaction that wire-tapping was unlawfully employed'")

(quoting Nardone v. United States, 308 U.S. 338, 341 (1939)).

### (b)    **Analysis**

Mirzoyan argues that (1) the agent affidavits submitted in support of the wiretap

applications were vague and general; (2) the Government's interpretations of the Defendants'

conversations were speculative, and (3) the Government did not demonstrate probable cause as

to each interceptee listed in the wiretap applications.  (Def. Br. (Dkt. No. 338) at 23-24; see also

Def Br. (Dkt. No. 341) at 38-39; Def. Br. (Dkt. No. 335) at 35-36)

As discussed below, Agent Koch's affidavits provide information in sufficient

detail to demonstrate probable cause to believe that communications constituting evidence of the

crimes listed in the applications would be obtained from the wiretaps on each telephone.  Agent

Koch's inferences as to the meaning of certain words and conversations he overheard are

permissible, because he properly relied on his training and experience and his cumulative

knowledge obtained from the investigation in drawing those inferences.

As an initial matter, Mirzoyan errs in arguing that the Government lacked

probable cause as to each target subject named in the wiretap applications.  The Government is

not required to demonstrate probable cause as to each expected interceptee.  "A finding of

probable cause as to every . . . potential interceptee . . . is not required under Title III."  Segura,

2001 WL 286850, at *12 (D. Conn. 2001) (citing United States v. Figueroa, 757 F.2d 466, 475

(2d Cir. 1985) ("[T]he government need not establish probable cause as to all participants in a

conversation.  If probable cause has been shown as to one such participant, the statements of the other participants may be intercepted if pertinent to the investigation.").

Accordingly, to the extent that Mirzoyan argues, with regard to the Terdjanian, Amroyan, Avetisyan, and Yepiskoposyan phones, that the Government failed to establish that "a crime was being committed by [Mirzoyan]," (Def. Br. (Dkt. No. 335) at 35; Def. Br. (Dkt. No. 338) at 23), he relies on an improper standard.  Probable cause "is established if the 'totality of the circumstances' contained in the affidavit indicates a probability of criminal activity and that evidence of the criminal activity could be obtained through the use of electronic surveillance." United States v. Trippe, 171 F.Supp.2d 230, 234 (S.D.N.Y. 2001).  The Government was not required to demonstrate – as to these phones – that Mirzoyan was committing a crime.  "The focus of the probable cause determination under Title III is on the facility of communication, and on the person primarily in control of that facility," and the Government need not establish probable cause as to all persons whose conversations are expected to be intercepted over the wiretap.  Segura, 2001 WL 286850, at *12.

The Court considers below whether there was sufficient probable cause for each wiretap order Mirzoyan has challenged.

### (i)      Amroyan and Terdjanian's Phones

On September 2, 2009, the Government obtained authorization to conduct electronic surveillance of Defendant Robert Terdjanian and Defendant Varujan Amroyan's cell phones.  The factual basis for the Government's wiretap application for these phones is set forth in the September 2, 2009 affidavit of FBI Special Agent Jeffrey Koch.

As to this application, Mirzoyan argues that (1) "the Government failed to establish probable cause to believe that a crime was being committed by Defendant"; and (2) the

Government offered only two vague intercepted calls in support of its application. (Def. Br. (Dkt. 338) at 23)

With respect to Mirzoyan's first point, as discussed above, the Government is not required to demonstrate that there is probable cause as to each target subject. As to his second point, the Government offered – in Agent Koch's 105-page affidavit – much more evidence than the two calls cited by Mirzoyan's counsel. Koch's affidavit includes, inter alia, informant and cooperating witness testimony directly implicating Amroyan, Terdjanian, and others in bank fraud, car leasing fraud, and/or credit card fraud. (9/2/09 Koch Aff. at 022494-95, 022497) Koch's affidavit also provides summaries of numerous calls made over the Amroyan and Terdjanian phones in which the two men discussed with others a wide variety of criminal activity, including health care fraud (id. at 022553-54), immigration fraud (id. at. 022546-47), sale of contraband cigarettes (id. at 022560), extortion (id. at 022561), fabricated identification documents (id. at 022562), fraudulent checks (id. at 22564-65), and stolen credit cards (id. at 022565-66).

Under these circumstances, Mirzoyan's claim that two of the calls involving him did not provide clear proof of involvement of criminal activity (Def. Br. (Dkt. No. 338) at 23) is irrelevant. In any event, Agent Koch's inference that these conversations concerned the clearing of fraudulent checks was credible. The Koch affidavit provides extensive evidence of the target subjects' involvement in check kiting schemes and other forms of bank fraud. In this context, Terdjanian's statement to Mirzoyan that the "things" Mirzoyan gave him "went through fine," and that "the 15" had cleared, and Mirzoyan's statement that he just did one for "27," and Terdjanian's statement that that he would call to verify the funds (id. at 022565), can readily be understood as pertaining to the cashing of fraudulent checks. While Mirzoyan argues that the

14

words "check," "bank," or "dollars," were never used, a finding of probable cause is not precluded merely because "many of the conversations were in vague and coded language." United States v. Bellomo, 954 F.Supp. 630, 638 n.3 (S.D.N.Y. 1997).

In sum, the September 2, 2009 Koch affidavit provided more than adequate probable cause for wiretap applications concerning Terdjanian and Amroyan's phones. As to Amroyan's phone, the Koch affidavit demonstrates that it had been used to discuss, inter alia, trafficking in contraband cigarettes (9/2/09 Koch Aff. at 022560, 022562), extortion (id. at 022558-61, 022563), the purchase of false identification documents (id. at 022562), and fraudulent schemes to sublease cars. (Id. at 022561-62) Amroyan's awareness that he was discussing criminal activities was also demonstrated by his comment to Chukray that he "does not want to talk about this" over the phone. (Id. at 022534-35) As to Terdjanian's phone, Agent Koch provided evidence that Terdjanian had used his phone to discuss, inter alia, forging checks and other aspects of bank fraud, extortion, and the purchase and use of stolen credit cards. (Id. at 022554-58, 022564-67)

### (ii)      Mirzoyan's Phone

On November 3, 2009, the Government made its first application to intercept communications over Mirzoyan's phone. (11/3/09 Mirzoyan Application) Mirzoyan argues that this application contains no information "resembling evidence of a crime." (Def. Br. (Dkt. No. 341) at 38)

The November 3, 2009 Koch Affidavit describes in some detail a fraud scheme involving stolen identities of Medicare participants. (11/3/09 Koch Aff. at 020325) Koch explains how agents interviewed "Doctor 1," whose identity was stolen by someone who then opened a clinic in his name and began to fraudulently bill Medicare. (Id.) Through physical

surveillance, Medicare records, and bank records, agents connected Terdjanian to the fraudulent Doctor 1 bank account.  (Id. at 020327-28)  The name "Oleg Kamarine" was central in making the connection between the Defendants and the Medicare fraud scheme, because $90,000 in fraudulent funds deposited into the "Doctor 1" bank account were subsequently disbursed to an account in the name of Oleg Kamarine and to Telya Corporation.  (Id. at 020327)

Agent Koch explains how he learned that Terdjanian uses the alias "Oleg Kamarine" and controls Telya.  (11/3/09 Koch Aff. at 020327-28)  On September 3, 2009, agents intercepted a call over Terdjanian's phone in which he told an HSBC employee that his name was "Oleg Kamarine" and that he was the sole owner of Telya.  (Id.)  Moreover, statements for Oleg Kamarine's bank accounts were mailed to Terdjanian's father.  (Id.)

Agent Koch's November 3, 2009 affidavit also demonstrated Mirzoyan's involvement in the Medicare fraud scheme and the use of his phone in furtherance of that and other fraud schemes.  See Koch 11/3/09 Affidavit 020328-32.  Koch recounts telephone conversations between Mirzoyan and Terdjanian in which the two discuss various deposits and withdrawals that Agent Koch was able to match to bank records concerning the Doctor 1 account.  (Id. at 020329-30)  Terdjanian is overheard using his "Oleg Kamarine" alias when speaking with Mirzoyan and references "15,676.98" – the precise amount of a check drawn on the Doctor I bank account and made payable to "Oleg Kamarine."  (Id. at 020329)

Koch's affidavits submitted in support of applications to extend the wiretap on Mirzoyan's phone also demonstrate adequate probable cause.  In these affidavits, Koch sets forth conversations in which Mirzoyan, over the target phone, discusses setting up new medical clinics for Medicare fraud purposes, creating false bills for these clinics, receiving money from Medicare, depositing fraudulent proceeds into bank accounts, and transferring fraudulent

16

proceeds to other accounts.  (See, e.g., 12/10/09 Koch Aff. at 020424-9; 1/11/10 Koch Aff. at 020529; 2/17/10 Koch Aff. at 020643, 020648, 020872; 4/22/10 Koch Aff. at 020757, 020868; 5/24/10 Koch Aff. at 020998)  Mirzoyan is overheard participating in conversations involving the name Oleg Kamarine, (12/10/09 Koch Aff. at 020426) and shell corporations used in the Medicare fraud scheme.  (12/10/09 Koch Aff. at 020430; 1/11/10 Koch Aff. at 020519, 020531) He also discusses the stolen identification information of physicians (1/11/10 Koch Aff. at 020527) and stolen patient identities (4/22/10 Koch Aff. at 020875).  Mirzoyan is also intercepted discussing with others whether a bank account will be closed.  Mirzoyan states, "if it is open, then let it stay open. . . .[B]y the time they get to the investigation, you know it will be two months.  Let them check, so what."  Mirzoyan then asks whether, if the account is closed, they can use the "same information somewhere else."  (2/17/10 Koch Aff. at 020647; 6/29/10 Koch Aff. at 021123)  The Koch affidavits also demonstrate that Mirzoyan used his phone to call the Medicare Part B Service System (2/17/10 Koch Aff. at 020632-33) and to read a list of Medicare codes to a co-conspirator.  (3/22/10 Koch Aff. at 020758)

In sum, both the initial application to intercept communications over Mirzoyan's phone and the extension applications were supported by sufficient probable cause.

### (iii)     Yepiskoposyan and Avetisyan's Phones

Based on intercepted communications from the phones discussed above, the Government obtained court orders in June 2010 to intercept communication on phones used by defendants Artur Yepiskoposyan and Aleksandr Avetisyan.  (6/28/10 Koch Aff. at 022952)

The June 2010 Koch Affidavit submitted in support of the Government's wiretap application concerning these phones summarizes intercepted calls between Yepiskoposyan and Mirzoyan between December 2009 and May 2010 in which they discuss the Medicare fraud

scheme, including fraudulent clinics and the false names used to open bank accounts for those clinics.  (6/28/10 Koch Aff. at 022952-55)  Yepiskoposyan was using the target phone during these conversations with Mirzoyan.  (Id.)  "Levon Papikan" and "Bui" are two of the names mentioned in these calls.  (Id. at 022953-54)  The name "Levon Papikan" had been used to open bank accounts for various medical clinics that had submitted fraudulent bills to Medicare.  (Id.) Agent Koch concluded that "Bui" related to Dr. Edward N. Bui.  Dr. Bui told Medicare that he had not authorized his name to be used for certain Medicare billings.  (Id.)

The June 2010 Koch Affidavit also describes Avetisyan's conversations with Terdjanian, over the target Avetisyan phone, regarding fraudulent credit cards and extortion.  (Id. at 022956-57, 022959-60)  While Avetisyan and Terdjanian speak of "songs," "CD's," and "discs," they make reference to the "last four" and "expiration dates," leading Agent Koch to the reasonable conclusion that the two men were discussing stolen credit cards.  (Id. at 022959 & n.7)

In sum, the Court concludes that the June 2010 Koch affidavit set forth adequate probable cause for the wiretap order issued concerning Yepiskoposyan and Avetisyan's phones.

### 4.   <u>Necessity</u>

Mirzoyan next argues that the wiretap evidence should be suppressed for failure to comply with the necessity requirement.

Section 2518(1)(c) provides that any application for authorization to intercept wire, oral or electronic communications must demonstrate that "normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous."  18 U.S.C. § 2518(1)(c).  As the Supreme Court has explained, wiretaps are "'not to be routinely employed as the initial step in criminal investigation.  Rather, the applicant

must state and the court must find that normal investigative procedures have been tried and failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous.'"  United States v. Serrano, 450 F.Supp.2d 227, 236 (S.D.N.Y. 2006) (quoting United States v. Giordano, 416 U.S. 505, 515 (1974)).  This requirement ensures that "wiretapping is not resorted to in situations where traditional investigative techniques would suffice to expose crime." Concepcion, 579 F.3d 214, 218 (2d Cir. 2009) (quoting Kahn, 415 U.S. at 153 n.12).  Thus, "'an affidavit offered in support of a wiretap warrant must provide some basis for concluding that less intrusive investigative procedures are not feasible.'" Serrano, 450 F.Supp. 2d at 236 (quoting United States v. Lilla, 699 F.2d 99, 103 (2d Cir. 1983).

The purpose of this requirement, however, is not to preclude wiretapping "'until after all other possible means of investigation have been exhausted by investigative agents; rather, [the statute] only require[s] that the agents inform the authorizing judicial officer of the nature and progress of the investigation and of the difficulties inherent in the use of normal law enforcement methods.'"  United States v. Diaz, 176 F.3d 52, 111 (2d Cir. 1999) (quoting United States v. Vazquez, 605 F.2d 1269, 1282 (2d Cir.1979)); United States v. Lombardo, No. 98 Cr. 1180, 1999 WL 305096, at *5 (S.D.N.Y. May 14, 1999).

"While generalized or conclusory statements in an application are insufficient to support a showing of necessity, the application must be viewed in a practical and common sense manner and need be only minimally adequate to support the issuing judge's determination of necessity." Trippe, 171 F. Supp. 2d 230, 236 (S.D.N.Y. 2001) (internal citations omitted).  "The issuing judge's determination that the Government has made adequate use of alternative investigatory techniques is entitled to substantial deference." Id. (citing United States v. Wilkinson, 754 F.2d 1427, 1433 (2d Cir. 1985)).

Mirzoyan contends that "little to no investigation was done of [Mirzoyan]" before the Government resorted to wiretapping, and complains that the Government's justifications for why other investigative techniques were insufficient are "conclusory, vague, and cursory," and that the language in the applications is "virtually identical."  (See, e.g., Def. Br. (Dkt. No. 338) at 13-14)

Mirzoyan cites no law suggesting, however, that the Government is required – in connection with the necessity requirement – to make an individualized presentation as to each target subject and the efficacy of each potential investigative tool as to that target.  Moreover, the fact that the Government has repeatedly made the same or similar statements as to why alternative investigative means are not practical does not mean that those reasons are invalid. See United States v. Herrera, No. 02 CR 0477, 2002 WL 31133029, at *2 (S.D.N.Y. Sept. 23, 2002) (upholding use of "boilerplate" language); United States v. Restrepo, Crim. No. N–88–3(JAC), 1989 WL 4292, *4 (D. Conn. Jan. 9, 1989) ("the inclusion in an affidavit of general or boilerplate statements does not of itself render the affidavit inadequate [under § 2528(1)(c) ]. . . . What matters is that the affidavit indicate why such procedures have not been or are not likely to be adequate in the particular case.") (citing cases), aff'd, 884 F.2d 1381 (2d Cir. 1989).

While the Government made use of many "normal law enforcement methods," such as physical surveillance and review of phone records, the Koch affidavits – as discussed below – explain why these tools were not likely to permit agents "to identify fully the nature and scope of the organization, including the identities of the individuals who are connected to the conspiracy." (11/3/09 Koch Aff. at 020337).

First, there is no reason to believe that the use of undercover agents would have been successful in this investigation.  As Koch stated, "an undercover operation is not feasible

due, in part, to the unwillingness of the TARGET SUBJECTS to deal extensively with outsiders who are not already known to them."  (9/2/09 Koch Aff. at 022575-76; see also 11/2/09 Koch Aff. at 020338; 12/10/09 Koch Aff. at 020435).  The difficulties in pursuing an undercover operation against the defendants were compounded by the fact that the target subjects were largely Armenian nationals, who were "unlikely to trust those who they do not directly know" (9/2/09 Koch Aff. at 022569), and unlikely to welcome non-Armenians into their organization. (6/28/10 Koch Aff. at 022993).

The same is true as to the use of a confidential informant.  Koch explains that "none of the human sources identified herein . . .  know or are in a position to know all of the TARGET SUBJECTS, much less be privy to the full range of their ongoing criminal activity." (9/2/09 Koch Aff. at 022567; see also 11/3/09 Koch Aff. at 020338) (as to confidential informants, "[b]ased on my training and experience, it would be difficult if not impossible to introduce a CI [to the target subjects] without the use of a trusted intermediary (none are known) because the [targets] would be unlikely to trust [the] individual"); (1/11/10 Koch Aff. at 020542) (same).  Koch explained that while the Government had obtained information from confidential sources, these individuals only knew some of the target subjects, and had no ability to gain access to other targets.  (9/2/09 Koch Aff. at 022567-70; 12/10/09 Koch Aff. at 020435 ("At present, the FBI knows of no confidential informants who have ties to [Mirzoyan or certain other target subjects].  Based on my training and experience, it would be difficult if not impossible to introduce a CI to Mirzoyan or [the others] without the use of a trusted intermediary (none are known) because the Target Subjects would be unlikely to trust such an individual.")).[4]

---

[4]  Mirzoyan argues that Terdjanian was formerly a confidential informant for the FBI, and that this fact demonstrates that confidential informants could be utilized in the investigation.  (Def. Br. (Dkt. No. 335) at 29; Def. Br. (Dkt. No. 341) at 28))  Agent Koch explained in his June 2010

As to grand jury subpoenas, interviews, more extensive physical surveillance, and search warrants, these techniques would likely place the Defendants on notice of the investigation. The limited utility of these techniques is explained in the September 2009 Koch Affidavit. (Id. at 022573 (use of grand jury), 022571 (physical surveillance), 022576-77 (interviews)). Koch also explains that executing arrest warrants would run the risk of exposing the ongoing covert investigation, and lead the other subjects to take "defensive measures" such as hiding or destroying evidence. (9/2/09 Koch Aff. at 022575) Similarly, executing search warrants would "inevitably tip-off" the targets of the investigation. (Id. at 022574) Given that the target subjects were Armenian nationals, alerting them to the existence of the investigation could well lead to their flight to their native Armenia. (6/28/10 Koch Aff. at 022995)

While agents made use of physical surveillance throughout the investigation, this technique was not adequate to meet the objectives of the investigation, given that the target subjects were often behind closed doors. See 9/2/09 Koch Aff. at 022571-72. See Gambino, 734 F.Supp. at 1103; United States v. Cartagena, 593 F.3d 104, 110 (1st Cir. 2010) ("Even if traditional investigative procedures produce some results, the partial success of the investigation does not mean that there is nothing more to be done.")

Koch's discussion of the limitations inherent in this "normal" investigative tool was not cursory or conclusive. Applications to extend electronic surveillance updated the Court

---

affidavit, however, that Terdjanian had committed new crimes and was no longer working at the direction of law enforcement agents:  "TERDJANIAN cannot effectively be used as a proactive cooperating witness given that wire interceptions demonstrate that he is involved in major fraud and extortion schemes (which he has not admitted to).  Additionally, asking Terdjanian to proactively cooperate against the TARGET SUBJECTS poses unacceptable investigative risks as there is a substantial chance that Terdjanian would warn the other subjects about the investigation."  (6/22/10 Koch Aff. at 021132 and n.7)  "Agents are not required to resort to measures that will clearly be unproductive."  United States v. Terry, 702 F.2d 299, 310 (2d Cir. 1983).

as to recent physical surveillance and continued to explain the limited utility of physical

surveillance in light of the nature of the alleged fraudulent scheme.  See, e.g., 11/3/09 Koch Aff.

at 020335 (noting limitations of physical surveillance given that Mirzoyan and Terdjanian lived

in different states located across the country).

    In sum, the Government provided a "reasoned explanation" that "squares with

common sense," United States v. Scala, 388 F.Supp.2d 396, 404 (S.D.N.Y. 2005), as to why only

a wiretap would achieve all of its investigatory goals.  That "is all that is required."  Shipp, 578

F.Supp. at 989.  This was an investigation of a complex and far-flung criminal enterprise,

stretching from New York to Los Angeles to Armenia, and involving largely Armenian

nationals.  The wiretap applications adequately explain why electronic surveillance is necessary

to identify all participants in the specified unlawful activities and the full scope of those illegal

activities.  Mirzoyan's arguments as to necessity are therefore rejected.

    **5.**  **Minimization**

    Mirzoyan argues that all wiretap evidence must be suppressed because the

Government did not comply with the statutory minimization requirement.

    **a.**  **Legal Standard**

    Every wiretap order must "contain a provision that the authorization to intercept

. . . shall be conducted in such a way as to minimize the interception of communications not

otherwise subject to interception under this chapter."  18 U.S.C. § 2518(5).  The minimization

requirement "'does not forbid the interception of all nonrelevant conversations, but rather

instructs the agents to conduct the surveillance in such a manner as to 'minimize' the

interception of such conversations.'"  United States v. Salas, No. 07 Cr. 557(JGK), 2008 WL

4840872, at *6 (S.D.N.Y. Nov. 5, 2008) (quoting Scott v. United States, 436 U.S. 128, 140

(1978)).  Compliance with the minimization requirement is measured by the reasonableness of

the surveilling agents' conduct, which "will depend on the facts and circumstances of each case."

Scott, 436 U.S. at 140; see also id. at 139-40 ("Because of the necessarily ad hoc nature of any

determination of reasonableness, there can be no inflexible rule of law which will decide every

case.").  "[T]he percentage of non-pertinent calls [may be] relatively high and yet their

interception [may] still [be] reasonable."  Scott, 436 U.S. at 140.  Moreover, "[t]he minimization

requirement does not extend to calls lasting two minutes or less."  Salas, 2008 WL 4840872, at

*6; see also United States v. Capra, 501 F.2d 267, 275-76 (2d Cir. 1974); United States v.

Pichardo, No. 97 CR. 233(LMM), 1999 WL 649020, at *6 (S.D.N.Y. Aug. 25, 1999).

   "'[C]ourts have identified several measures which the government can take to

increase likelihood of compliance with § 2518(5):  (1) maintenance of monitoring logs; (2)

judicial supervision of the progress of the surveillance; (3) provision of written and oral

instructions to monitoring personnel concerning the legal requirements for minimization; (4)

requiring all monitoring personnel to read the court orders and applications, and posting of the

minimization instructions, court orders, and applications at the monitoring plant; and (5)

supervision by the prosecutor.'"  Salas, 2008 WL 4840872, at *8 (quoting Pichardo, 1999 WL

649020, at *6 (internal citations omitted)).

   "The percentage of calls minimized is not dispositive of whether the statutory

minimization requirement was satisfied."  Salas, 2008 WL 4840872, at *7 (citing Scott, 436 U.S.

at 132).  In Scott, 436 U.S. at 132, "virtually all of the conversations [over the tapped phone]

were intercepted while only 40% of them were shown to be narcotics related."  The Supreme

Court nonetheless held that the wiretap evidence should not be suppressed, explaining that the

minimization inquiry entailed "an objective assessment of the officer's actions in light of the

facts and circumstances confronting him at the time," rather than an assessment of the officer's "good-faith efforts to comply with the minimization requirement . . . of § 2518(5)."  Id. at 135-37.  The Court cautioned against "blind reliance on the percentage of nonpertinent calls intercepted," explaining that the focus should instead be on "the circumstances of the wiretap." Id. at 140-41.  Suppression is an appropriate remedy only where the agents' minimization efforts as a whole were not objectively reasonable.  See Scott, 436 U.S. at 136-37.

The Government has the burden of making a prima facie showing of compliance with the statutory minimization requirement.  United States v. Rajaratnam, No. 09 Cr. 1184(RJH), 2010 WL 4867402, at *27 (S.D.N.Y. Nov. 24, 2010) (citing United States v. Rizzo, 491 F.2d 215, 217 n. 7 (2d Cir. 1974); United States v. Napolitano, 552 F.Supp. 465, 476 (S.D.N.Y. 1982).  "Once a prima facie showing is made, the burden shifts to the defendant to show that, despite a good faith compliance with the minimization requirements, "'a substantial number of non-pertinent conversations have been intercepted unreasonably.'"  Rajaratnam, 2010 WL 4867402, at *27 (quoting United States v. Menendez, No. 04-219, 2005 WL 1384027, at *3 (S.D.N.Y. June 8, 2005)).  Where a defendant cannot make such a showing, courts generally reject a claim of improper minimization without a hearing.  See United States v. Prada, No. 90 Cr. 306–S–1 (KMW), 1991 WL 161323, at *4 (S.D.N.Y. Aug. 13, 1991), aff'd, 19 F.3d 9 (2d Cir. 1994) (citing United States v. Cirillo, 499 F.2d 872, 880 (2d Cir. 1974); United States v. Ianniello, 621 F.Supp. 1455, 1470 (S.D.N.Y. 1985), aff'd, 808 F.2d 184 (2d Cir. 1986)).

"The determination as to whether minimization should have occurred requires an assessment of the reasonableness of the interceptions in light of the purpose of the wiretap and the totality of the circumstances."  Gotti, 42 F.Supp.2d at 268 (citing Napolitano, 552 F.Supp. at 476).  Minimization may be more difficult, and more extensive surveillance may therefore be

permissible, where the investigation is aimed at a "widespread conspiracy."  See Scott, 436 U.S. at 140 ("when the investigation is focusing on what is thought to be a widespread conspiracy more extensive surveillance may be justified in an attempt to determine the precise scope of the enterprise.  And it is possible that many more of the conversations will be permissibly interceptible because they will involve one or more of the co-conspirators."); Napolitano, 552 F.Supp. at 476 ("In an investigation which focuses on a "widespread conspiracy," more extensive surveillance is permitted.").  The use of code words or jargon may make minimization more difficult and therefore may also justify more extensive surveillance.  See, e.g., Scott, 436 U.S. at 140 ("guarded or coded language"); United States v. Uribe, 890 F.2d 554, 557 (1st Cir. 1989) (same); United States v. Hoffman, 832 F.2d 1299, 1308 (1st Cir. 1987) (same); Pichardo, 1999 WL 649020, at *6 ("code words or jargon").

<h4>b.    <u>Analysis</u></h4>

As discussed below, "[t]he affidavits, periodic reports and daily logs which have been submitted to and reviewed by this court indicate that the government has established a prima facie showing of compliance with minimization standards."  Napolitano, 552 F.Supp. at 476-77 (citing United States v. Cirillo, 499 F.2d 872, 880-81 (2d Cir. 1974)).  Given that Mirzoyan has "failed to provide specific instances to challenge the government's submission" – despite full access to the materials necessary to make such a challenge – the Court will reject his minimization objections.

As an initial matter, the record before this Court demonstrates that the supervising Assistant United States Attorney ("AUSA") gave the agents and translators working on this investigation instructions – as to each wiretap – concerning the proper monitoring and interception of wire communications.  The agents and translators who participated in the

interception of calls also certified in writing that they had received and reviewed those instructions.  (Richards Aff. ¶¶ 4, 9, 14, and Exs. A at 17-21, C at 18-20, F at 18-19)  The instructions provided to the agents and translators included a provision directing the agents to "make a good faith determination of whether or not each communication is relevant" to the illegal activities described in the instructions.  (Richards Aff. Ex. A at 3, Ex. C at 2-3, Ex. F at 3)  The agents and translators were directed to listen to the beginning of each communication "only so long as is necessary to determine the nature of the communication and, in any case, no longer than a few minutes unless the communication is 'pertinent.'"  (Richards Aff. Ex. A at 4, Ex. C at 5, Ex. F at 5)

       These instructions were posted at the monitoring facility at the FBI offices at 26 Federal Plaza, New York, New York.  (Richards Aff. ¶ 4)  Special Agent Nashaun Richards' affirmation describes the procedures in place for interception and minimization of calls over the Amroyan, Terdjanian, Yepiskopyan, Avetisyan, and Mirzoyan phones.  (Richards Aff. ¶¶ 4-17)  Because many of the calls were in Eastern or Western Armenian or Russian, translators proficient in these languages worked with agents in monitoring the conversations.  (Id. at ¶¶ 5,10, 15)  The translators listened contemporaneously with the agents to foreign language conversations and worked with the agents in real time to determine whether calls were pertinent.  (Id. at ¶¶ 5, 10, 15)  During the interceptions, the translators summarized the conversations on line sheets.  (Id. at ¶¶ 5, 11)  The FBI, in conjunction with the supervising AUSA, prepared periodic reports of the calls which were provided to the Court for review.  (Id. ¶¶ 7, 12, 16, Exs. B, D, G)

       The Court finds that the Government has established that it made a reasonable attempt to minimize the interception of non-relevant conversations given the unusual

circumstances of this case.  The wiretaps employed by the Government presented enormous

minimization challenges.  The intercepted conversations largely took place in various dialects of

Armenian.  While translators worked simultaneously with agents monitoring the wiretaps, it is

evident from this Court's review of transcripts of a number of the intercepted conversations that

the meaning of many of these conversations would not have been immediately apparent.  In

addition to their use of relatively inaccessible foreign languages, the defendants – some of whom

indicated concern about speaking over the phone – commonly spoke in code, used nicknames,

and in at least one instance, used an alias.  The scope of the alleged illegal enterprise was vast in

every way, and the scope of authorization provided in the court orders was correspondingly

broad.  See, e.g., Sept. 2, 2009 Order, at 022481; 11/3/09 Koch Aff. at 020319.  The participants

in the enterprise ranged from New York to California to Armenia.  The criminal activities ranged

from Medicare fraud, to extortion, to credit card fraud, to immigration fraud, to trafficking in

contraband cigarettes, among other crimes.  Twenty-eight individuals were charged in this case

alone, all but two of whom have pleaded guilty.[5]  Finally, the vast majority of intercepted calls

lasted less than two minutes, and the agents minimized a significant percentage of the total

calls.[6]  (Richards Aff. ¶¶ 8, 13, 17)

---

[5]  A related case, United States v. Chervin, 10 Cr. 918 (RPP), with 18 defendants, is pending
before Judge Patterson.

[6]  For example, 18,666 calls were intercepted over Mirzoyan's phone.  Only 2624 lasted longer
than two minutes.  927 calls were minimized.  2897 calls were pertinent.  Of the 7720 calls
intercepted over Amroyan's phone, 1273 lasted longer than two minutes.  350 calls were
minimized.  1869 of the intercepted calls were pertinent.  With respect to Terdjanian's phone,
5688 calls were intercepted, but only 876 lasted more than two minutes.  660 calls were
minimized.  1117 calls were pertinent.  Of the 4071 calls intercepted over Yepiskoposyan's
phone, 417 calls lasted more than two minutes.  253 calls were minimized.  615 calls were
pertinent.  Of the 2791 calls intercepted over Avetisyan's phone, 610 lasted more than two
minutes.  124 calls were minimized.  682 calls were pertinent.  (Richards Aff. ¶¶ 8, 13, 17)
Mirzoyan has not disputed the call data submitted by the Government.  See Def. Mem. of Law in

Mirzoyan has not rebutted the Government's prima facie showing of good faith compliance with the minimization requirements, because he has not demonstrated that "a substantial number of non-pertinent conversations [were] intercepted unreasonably." Rajaratnam, 2010 WL 4867402, at *27.  Mirzoyan complains that agents minimized only a small percentage of the calls, and asserts that it is "hard to believe that such a high volume of calls required such a minimal amount of minimization."  (Def. Br. (Dkt. No. 341) at 40; see also Def. Br. (Dkt. No. 335) at 38 (concerning Yepiskoposyan's phone); Def. Br. (Dkt. No. 338) at 26) (concerning Amroyan's phone).  Mirzoyan's numerical argument proves nothing, however, because, inter alia, he ignores the fact that the vast majority of calls were less than two minutes, and thus were not subject to a minimization requirement.  Mirzoyan also ignores the fact that a substantial number of calls on each wiretap were minimized.  In any event, "the percentage of calls minimized is not dispositive of whether the statutory minimization requirement was satisfied." Salas, 2008 WL 4840872, at *7 (citing Scott, 436 U.S. at 132).

In addition to his numerical argument, Mirzoyan asserts generally that "counsel has discovered numerous conversations intercepted by the Government that should have been minimized." [7]  (Def. Br. (Dkt. No. 341) at 40)  Mirzoyan does not specifically identify any such call, however, although he has access to all of the information necessary to identify any

---

Resp. to Richards Aff. (Dkt. No. 435))  Given the circumstances of this case described above, nothing about this data suggests that agents ignored their minimization obligations.

[7]  Mirzoyan describes, but does not identify, three calls that should have minimized.  According to Mirzoyan, they involved Mirzoyan and Terdjanian discussing travel plans, Mirzoyan discussing his health with several unidentified individuals, and another conversation – between unidentified participants – about a child's health.  (Def. Br. (Dkt. No. 341) at 40-41)  Given that more than 37,000 calls were intercepted during this investigation, this Court has no idea what calls Mirzoyan is referring to.  In any event, his assertion that three calls should have been minimized does not, in the context of this vast wiretap investigation, demonstrate that the agents did not meet their statutory minimization obligations.

improperly monitored call with specificity.[8]  Failure to provide the required specificity warrants

rejection of a defendant's minimization objections.  See, e.g., United States v. Estrada, S2 94 Cr.

186 (MGC), 1995 WL 577757, at *7 (S.D.N.Y. 1995) ("Despite their possession of the ten-day

reports and line sheets, defendants do not identify any specific violations.  Accordingly, the

motion to suppress for failure to minimize is denied."), aff'd, 164 F.3d 620 (2d Cir. 1998);

United States v. McGuinness, 764 F. Supp. 888, 900 (S.D.N.Y. 1991) (denying motion to

suppress on minimization grounds without a hearing where defendant did not "indicate which of

the calls he contends were 'properly minimized' and which were not").

   Mirzoyan's motion to suppress the wiretap evidence on grounds of improper

minimization will be denied without a hearing.  See United States v. Menendez, No. S(3) 04 CR.

219 (DAB), 2005 WL 1384027, at *4 (S.D.N.Y. June 8, 2005); Pichardo, 1999 WL 649020, at

*6 (denying motion to suppress wiretap evidence without a hearing where defendant failed to

overcome the Government's prima facie showing of reasonableness).

## II. MOTION TO SUPPRESS PHYSICAL EVIDENCE

   On October 13, 2010, the Government executed search warrants at five locations:

(1) Mirzoyan's residence at 213 W. Kenneth Road, Glendale, California; (2) Mirzoyan's office at

740 East Wilson avenue, Suite 201, Glendale, California; (3) Defendant Yepiskoposyan's

residence at 4141 East Valencia Avenue, Apt. 204, Burbank, California; (4) medical laboratories

used by Defendant Jacob Pogosian, located at 703 Ivy Street, Glendale, California; and (5) a

medical billing office operated by Defendant Herayer Baghoumian located at 1314 West

Glenoaks Blvd., Office 202 in Glendale, California.  Mirzoyan has moved to suppress the

---

[8]  Mirzoyan has all documents related to the wiretaps, including the applications, affidavits,
issuing orders, periodic reports, and line sheets.  (Apr. 17, 2012 Tr. at 15)

evidence seized at all five locations.  For the reasons stated below, Mirzoyan's motion will be denied.[9]

A.      **Standing**

"A defendant seeking to suppress the fruits of a search by reason of a violation of the Fourth Amendment must show that he had a 'legitimate expectation of privacy' in the place searched."  United States v. Hamilton, 538 F.3d 162, 167 (2d Cir. 2008) (citing Rakas v. Illinois, 439 U.S. 128, 143 (1978)).  "This inquiry involves two distinct questions:  first, whether the individual had a subjective expectation of privacy; and second, whether that expectation of privacy is one that society accepts as reasonable."  Id. (citing Katz v. United States, 389 U.S. 347, 361 (1967) (Harlan, J., concurring); United States v. Chuang, 897 F.2d 646, 649 (2d Cir. 1990)).

It is axiomatic that "the proponent of a motion to suppress has the burden of establishing that his own Fourth Amendment rights were violated by the challenged search or seizure."  Rakas, 439 U.S. 128, 130 n.1 (1978).  Accordingly, a defendant asking a court to suppress evidence must demonstrate a legitimate expectation of privacy in the area that was searched.  See, e.g., id.; Rawlings v. Kentucky, 448 U.S. 98, 100 (1980).

Where the premises searched is a business, defendants seeking suppression must establish both that they are associated with the business and that they have a legitimate expectation of privacy in the part of the business that was searched.  O'Connor v. Ortega, 480 U.S. 709, 718 (1987).  Even where there is a subjective expectation of privacy in this setting, it gives rise to standing only where that expectation is one society considers reasonable.  See

---

[9]  To the extent that Mirzoyan's motion is based on his claim that the wiretap evidence should be suppressed, the Court has rejected that argument above.

Chuang, 897 F.2d at 650 (any subjective belief bank officer had in privacy of documents maintained at bank's premises objectively unreasonable given extensive regulation of banks).

There is no dispute here that Mirzoyan has standing to challenge the search of his residence and office.  As to the three remaining locations, however, Mirzoyan has not established that he had a legitimate expectation of privacy.  At the April 17, 2012 hearing, Mirzoyan argued that all of the defendants had an expectation of privacy in these locations because the Government alleged a conspiracy that tied all of the defendants to these locations.  (Apr. 17, 2012 Tr. at 9-10)  The law is clear, however, that a defendant does not enjoy standing to challenge a search merely because other members of an alleged conspiracy are using the searched premises in furtherance of the conspiracy, or because evidence obtained from the search will be introduced against all co-conspirators.  United States v. Padilla, 508 U.S. 77, 82 (1993) (standing requirement to challenge constitutionality of search or seizure is not subject to "coconspirator exception") (citing United States v. Alderman, 394 U.S. at 171-72 ("suppression of the product of a Fourth Amendment violation can be successfully urged only by those whose rights were violated by the search itself, not by those who are aggrieved solely by the introduction of damaging evidence.  Coconspirators and codefendants have been accorded no special standing."); Rakas, 439 U.S. at 131, n.1, 133-34; Rawlings, 448 U.S. at 106.

Because Mirzoyan has not made any showing that he had a reasonable expectation of privacy in Yepiskoposyan's residence, Pogosian's medical laboratories, or Baghoumian's office, his motion to suppress evidence obtained from these locations will be denied.

B.    **Probable Cause**

The Fourth Amendment provides that search warrants shall not be issued, except "upon probable cause, supported by Oath or affirmation." U.S. Const. amend. IV. The test for probable cause is "whether given all the circumstances set forth in the affidavit . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place." Gates, 462 U.S. at 238. The Court concludes that Agent Koch's October 8, 2010 affidavit set forth adequate probable cause for both Mirzoyan's residence and his office.

1.    **Background Information**

Agent Koch's October 8, 2010 affidavit provided probable cause to believe that Mirzoyan and others were involved in a large-scale scheme to defraud Medicare through the use of stolen doctor identities, phony medical clinics, fraudulent bills, and fraudulent bank accounts.

Koch notes at the outset of his affidavit that on September 30, 2010, a grand jury issued a sealed indictment charging Mirzoyan and 27 others with conspiracy to commit health care fraud and numerous other crimes, including RICO violations. Koch notes that the indictment charged that between 2006 and September 10, 2010, Mirzoyan and his co-conspirators had participated in a "nationwide scheme to defraud Medicare" through the use of 118 fraudulent Medicare providers, resulting in fraudulent bills to Medicare of $100 million and $35.7 million in fraudulent Medicare payments. (10/8/10 Koch Aff. at 018445-46) The grand jury indictment, of course, represents a finding that there is probable cause to believe that Mirzoyan engaged in all of the crimes in which he is charged in the indictment, including the alleged racketeering conspiracy. Rothstein v. Carriere, 373 F.3d 275, 282-83 (2d Cir. 2004).

Koch goes on to set forth facts concerning two fraudulent Medicare accounts, for which Medicare paid out more than $1 million in claims in 2009. (10/8/10 Koch Aff. at 018450-

56)  Koch explains how agents interviewed "Doctor 2," whose identity was stolen by someone who then opened a clinic in his name and began to fraudulently bill Medicare.  (Id. at 018453-56)  Through physical surveillance, Medicare records, and bank records, agents connected Defendant Robert Terdjanian to funds fraudulently obtained from Medicare through the use of Doctor 2's stolen identity.  (Id. at 018457-59)  As discussed above, the name "Oleg Kamarine" was central in making the connection to Terdjanian.  Agents determined that "at least $429,000 has been disbursed from the Doctor 2 Bank Account to an account in the name of one of TERDJANIAN's aliases, Oleg Kamarine, and $37,000 to, Telya Corporation, a corporate entity controlled by TERDJANIAN."  (Id. at 018457)

Agent Koch went on to recount the intercepted conversations discussed above – between Defendant Robert Terdjanian and Mirzoyan – in which the two men discussed the deposit of a $15,676.98 check from the Doctor 2 bank account into the account of "Oleg Kamarine" at JP Morgan Chase.  (Id. at 018458)  Agent Koch also provided facts concerning a conversation between Terdjanian and Mirzoyan on August 12, 2009 concerning a $27,310.97 wire transfer from Medicare to the Doctor 2 bank account that occurred that day.  Agent Koch's October 8, 2010 affidavit also recounts numerous conversations between Mirzoyan and co-conspirators in which he discusses the status of several clinics that were being used to defraud Medicare.  (Id. at 018459-66)

In sum, Agent Koch's October 8, 2010 affidavit provided strong evidence of Mirzoyan's involvement in a wide variety of federal crimes including, inter alia, mail and wire fraud, bank fraud, health care fraud, and money laundering.

2.      **Information Specific to Mirzoyan's Residence**

Agent Koch's October 8, 2010 affidavit provides adequate facts to establish that the 213 W. Kenneth Road location is Mirzoyan's home.  Koch explains that Mirzoyan was intercepted over the wiretap "describ[ing] to a taxi service . . . that he wanted to be picked up from his home and gave the address" in question.  (Koch 10/8/10 Aff. at 018481)  Mirzoyan also described his residence and renovations he planned at his home in multiple calls intercepted during July 2010.[10]  (Id. at 018485)  Physical surveillance of the home during October 2010, real estate records, bank statements, and interviews with bank representatives, all confirmed that Mirzoyan resided at this location.  (Id. at 018486).

Koch asserts in his affidavit that Mirzoyan "conducts portions of the Medicare fraud scheme from [his home], and keeps records related to bogus Medicare providers at [his home]."  The facts set forth in the affidavit support this assertion.  For example, Koch describes a call between Mirzoyan and his wife, Defendant Anna Termartirosyan – intercepted on January 8, 2010 – in which Mirzoyan asks his wife to go to his desk at home and to read him a list of numbers written on "a yellow paper."  Mirzoyan said, "I need the numbers from it.  There is an NPI, tell me that."  Termartirosyan then read Mirzoyan a list of ten numbers.  Koch explains that "the series of 10 numbers is the National Provider Identifier ("NPI") for a purported Medicare provider, CitiHealth, which purported to operate in Los Angeles and which billed Medicare for approximately $1,975,421, of which Medicare paid approximately $498,851."  (Id. at 018481-82)  Koch also set forth intercepted calls in which Mirzoyan arranged with his alleged co-conspirators to pick up money at his home, allegedly the proceeds of the Medicare fraud scheme.  (Id. at 018482-85)

---

[10]  Mirzoyan moved out of his Kenneth Road home temporarily in July 2010 so that it could be renovated.  (Id. at 018480, 018485-86)

The Court concludes that Agent Koch's October 8, 2010 affidavit provided sufficient probable cause to support the search warrant issued for Mirzoyan's home.

**3.      Information Specific to Mirzoyan's Office**

Agent Koch asserted in his October 8, 2010 affidavit that Mirzoyan, together with Defendants Yepiskoposyan and Gayane Khachaturyan, used an office located at 740 East Wilson Avenue, Suite 201, Glendale, California, in furtherance of the Medicare fraud scheme. (Id. at 018466-79)

Mirzoyan's and Khachaturyan's use of the East Wilson Avenue office was confirmed by both physical surveillance and by intercepted phone conversations, in which Mirzoyan referred to being " at the office" and gave directions to the East Wilson Avenue location. (Id. at 018467, 018472-75, 018477-79)  Agent Koch also sets forth the substance of intercepted calls between Mirzoyan and Defendant Khachaturyan in which Mirzoyan asks her to find folders in the office or directs her to a computer file in order to respond to callers asking to speak with certain doctors or seeking information about certain clinics.  Khatchaturyan has told the callers that the doctors are "out of the office."  The calls recounted by Koch refer to a number of clinics that the Government claims were being used to defraud Medicare. (Id. at 108470-72, 018476-77)

Agent Koch also recounts a November 4, 2009 conversation between Mirzoyan and Defendant Tikran Takvoryan in which the two men discuss problems with the computer software they are using to submit "batch" claims to Medicare.  Mirzoyan – who states that he is "at the office" – uses his computer while on the phone with Takvoryan to confirm the latter's complaints about problems with the software.  The next day, Takvoryan calls Mirzoyan – who is sick at home – from "the office" to make additional complaints about the computer software.  In

that conversation, Takvoryan refers to "IVR" – Medicare's Interactive Voice Response telephonic support system.  (Id. at 018467-70)

The Court concludes that Agent Koch's October 8, 2010 affidavit set forth sufficient facts to demonstrate that there was probable cause to believe that evidence concerning the Medicare fraud scheme would be recovered at Mirzoyan's office.[11]

## III.    THE INDICTMENT IS NOT MULTIPLICITOUS

Mirzoyan is named in Count One (RICO conspiracy, in violation of 18 U.S.C. § 1962(d)); Count Two (health care fraud conspiracy, in violation of 18 U.S.C. § 1349); Count Three (bank fraud conspiracy, in violation of 18 U.S.C. § 1349); Count Four (money laundering conspiracy, in violation of 18 U.S.C. § 1956(h)); Count Five (conspiracy to commit fraud in connection with identity theft, in violation of 18 U.S.C. § 371); and Count Six (conspiracy to commit credit card fraud, in violation of 18 U.S.C. 1029(b)(2)).  Mirzoyan contends that the Indictment is multiplicitous in violation of the Double Jeopardy Clause of the Fifth Amendment, asserting that it (1) "charges a single offense multiple times"; and (2) contains charges that "each require proof of the same set of facts and statutory elements."  (Def. Br. (Dkt. No. 381) at 4-5)

"An indictment is multiplicitous when it charges a single offense as an offense multiple times, in separate counts, when, in law and fact, only one crime has been committed." United States v. Chacko, 169 F.3d 140, 145 (2d Cir.1999).  Such a defect in an indictment violates the Double Jeopardy Clause of the Fifth Amendment, because it subjects a defendant to punishment for the same crime more than once.  See U.S. Const. amend. V; United States v.

---

[11]  Mirzoyan claims that the affidavit submitted in support of the search warrants was "unsigned," because the copy produced in discovery has an "/s/" mark on the signature line.  The Government represents (Gov't Br. 71) that Agent Koch swore to his affidavit before U.S. Magistrate Judge Alicia G. Rosenberg, and that the original sworn affidavit was filed with the Central District of California.

Dixon, 509 U.S. 688, 696 (1993).  A multiplicity claim cannot succeed, however, "unless the charged offenses are the same in fact and in law."  United States v. Estrada, 320 F.3d 173, 180 (2d Cir. 2003).  "[T]he critical double jeopardy inquiry is not factual, i.e., whether the same conduct is at issue in charges brought under different statutes, but legal, i.e., 'whether the offense – in the legal sense, as defined by Congress – complained of in one count is the same as that charged in another.'"  United States v. Basciano, 599 F.3d 184, 197 (2d Cir. 2010) (quoting Blockburger v. United States, 284 U.S. 299, 304 (1932)).

Thus, the critical issue in determining whether a multiple count indictment violates the Double Jeopardy Clause is "whether Congress intended to authorize multiple punishments for conduct that violates two statutory provisions."  United States v. Marrale, 695 F.2d 658, 662 (2d Cir. 1982).  In this Circuit, this issue is subject to a three-step inquiry.  Id. (citing Albernaz v. United States, 450 U.S. 333, 336-42 (1981)).  The first step is to analyze the structure of the statute or statutes in question.  "If the offenses charged are set forth in different statutes or in distinct sections of a statute, and each section unambiguously authorizes punishment for a violation of its terms, it is ordinarily to be inferred that Congress intended to authorize punishment under each provision."  United States v. Capanelli, No. 01 CR. 1121(CSH), 2004 WL 1542247, at *6 (S.D.N.Y. July 9, 2004) (citing Albernaz, 450 U.S. at 336-42).

The second step in the inquiry is "to determine whether the two offenses are sufficiently distinguishable from one another that the inference that Congress intended to authorize multiple punishments is a reasonable one."  Marrale, 695 F.2d at 662.  This part of the analysis requires application of the test announced by the Supreme Court in Blockburger v. United States, 284 U.S. 299 (1932).  That test requires a court to determine "whether each

38

provision [of a multiple count indictment] requires proof of a fact which the other does not."

Blockburger, 284 U.S. at 304.

The third and final step in the inquiry requires a court to compare the results obtained from the first two steps to the "legislative history of the provisions to discover whether a contrary congressional intention is disclosed.  If the legislative history either reveals an intent to authorize cumulation of punishments or is silent on the subject, the court should conclude that Congress intended to authorize multiple punishments."  Marrale, 695 F.2d at 662.  The same standard applies whether the Court is considering substantive offenses or conspiracy counts.

United States v. Barton, 647 F.2d 224, 235 (2d Cir. 1981) ("The same standard applies when Congress has provided separate statutes condemning conspiracies.").

Here, as to all six counts in which Mirzoyan is named, Congress has created distinct crimes, listed in separate sections of the United States Code.  This structure creates a presumption that Congress intended to authorize punishment under each provision.  Capanelli, 2004 WL 1542247, at *6; Albernaz, 450 U.S. at 336-42.

Moreover, each count "requires proof of a fact which the other does not."

Blockburger, 284 U.S. at 304.  Count One charges Mirzoyan with racketeering conspiracy under 18 U.S.C § 1962(d).  In order to convict a defendant of RICO conspiracy, the Government must "prove . . . the existence of an agreement to violate RICO's substantive provisions.  Thus, the government necessarily ha[s] to establish that [the defendant] agreed with his criminal associates to form the RICO enterprise."  Applins, 637 F.3d at 74; see also Salinas v. United States, 522 U.S. 52, 65 (1997).  The Government need not prove that the underlying predicate acts were committed, however.  Id. at 81 ("it is sufficient to allege and prove that the defendants agreed to the commission of multiple violations of a specific statutory provision that qualifies as RICO

39

racketeering activity"); see also United States v. Pizzonia, 577 F.3d 455, 462 (2d Cir. 2009)

("RICO's conspiracy provision . . . proscribes an agreement to conduct or to participate in the

conduct of the enterprise's affairs through a pattern of racketeering activity"); United States v.

Yannotti, 541 F.3d 112, 121 (2d Cir. 2008).

   Analysis of the five other counts in which Mirzoyan is named demonstrates that

each requires proof of elements different from those required under Count One, and different

elements when compared to each other.  Under Count Two, the Government must show that

Mirzoyan agreed to defraud a health care benefit program.  18 U.S.C. §§ 1349, 1347.  Count

Three requires a showing that Mirzoyan agreed to execute a scheme to either defraud a financial

institution or to "obtain any of the moneys, funds, credits, assets, securities, or other property

owned by, or under the custody or control of, a financial institution, by means of false or

fraudulent pretenses."  18 U.S.C. §§ 1349, 1344.  The money laundering conspiracy charged in

Count Four requires proof that Mirzoyan "agreed to:  1) conduct a financial transaction; 2)

involving the proceeds of specified unlawful activity; 3) knowing that the property involved in

the transaction represented the proceeds of some form of unlawful activity; and 4) knowing that

the financial transaction was designed in whole or in part to conceal or disguise the nature,

source, location, ownership, or control of those proceeds."  United States v. Henry, 325 F.3d 93,

103 (2d Cir. 2003).

   Count Five charges a conspiracy to defraud Medicare through the use of another

person's identification, in violation of 18 U.S.C. § 371.  "A conspiracy conviction under § 371

requires proof of three essential elements:  (1) an agreement among two or more persons, the

object of which is an offense against the United States; (2) the defendant's knowing and willful

joinder in that conspiracy; and (3) commission of an overt act in furtherance of the conspiracy by

at least one of the alleged co-conspirators." United States v. Svoboda, 347 F.3d 471, 476 (2d Cir. 2003) (citing United States v. Pinckney, 85 F.3d 4, 8 (2d Cir.1996)). Thus, Count Five requires the government to show (1) an agreement between Mirzoyan and at least one other person, the object of which was to defraud Medicare through the use of another person's identification documents; (2) Mirzoyan's knowing and willful joinder in that conspiracy; and (3) the commission of an overt act in furtherance of the conspiracy by at least one of the conspirators. Svoboda, 347 F.3d at 476; see United States v. Barton, 647 F.2d 224, 234-38 (2d Cir. 1981) (applying Blockburger and holding that the RICO conspiracy statute, 18 U.S.C. § 1962(d), and the general conspiracy statute, 18 U.S.C. § 371, require a showing of different elements). Count Six requires that Mirzoyan agreed to obtain more than $ 1,000 through access device fraud within a one-year period. 18 U.S.C. § 1029(b)(2). In sum, because the structure of these statutes indicates that Congress intended to authorize separate punishments for these offenses, and because each requires proof of an element that the others do not, there is no Double Jeopardy violation.

No different result is required because the predicate acts listed in the RICO conspiracy count (Count One) – substantive violations of the mail, wire, bank, immigration, and access device fraud statutes, and the extortion, money laundering, and contraband cigarette statutes – are charged as conspiracies in Counts Two-Six. "'[P]rosecutions for RICO and for its substantive predicates are distinct for double jeopardy purposes.'" United States v. D'Amico, 734 F.Supp.2d 321, 341 (S.D.N.Y. 2010) (quoting United States v. Gambino, 742 F.Supp. 855, 859 (S.D.N.Y.1990) and citing United States v. Esposito, 912 F.2d 60, 64-65 (3d Cir. 1990) (holding that where defendant has been acquitted on a RICO charge, the Double Jeopardy Clause does not bar a subsequent prosecution for the underlying predicate acts)); see also United States

v. Gonzalez, 921 F.2d 1530, 1536 (11th Cir. 1991) (concluding that "Congress intended RICO and its predicate crimes to be separate offenses and allow successive prosecutions").  Moreover, this Circuit ruled, as long ago as United States v. Barton, 647 F.2d 224, 236 (2d Cir. 1981), that the Double Jeopardy Clause presents no bar to a prosecution under the RICO conspiracy statute and a successive or simultaneous prosecution for related conduct under 18 U.S.C. § 371, the general conspiracy statute.  Barton, 647 F.2d at 236 (upholding consecutive sentences for RICO conspiracy and Section 371 conspiracy to possess explosives and damage buildings); see also United States v. Chimurenga, No. S 84 Cr. 818 (RLC), 1985 WL 545, at *2 (S.D.N.Y. Apr. 26, 1985) (simultaneous prosecution under § 371 and § 1962(d) does not violate Blockburger).

Finally, even assuming arguendo that the charges against Mirzoyan present a double jeopardy issue, his motion would be premature.  The Second Circuit has explained that "[w]here there has been no prior conviction or acquittal, the Double Jeopardy clause does not protect against simultaneous prosecutions for the same offense, so long as no more than one punishment is eventually imposed."  United States v. Josephberg, 459 F.3d 350, 355 (2d Cir. 2006); see also United States v. Jahedi, 681 F.Supp.2d 430, 436 (S.D.N.Y. 2009); United States v. Treacy, No. 08 Cr. 0366(RLC), 2009 WL 47496, at *3 (S.D.N.Y. Jan 08, 2009) (citing Josephberg, 459 F.3d at 355); United States v. Gupta, No. 11 Cr. 907(JSR), 2012 WL 1066804, *2.

Mirzoyan's motion to dismiss Counts Two-Six of the Indictment as multiplicitous will be denied.

IV.     THE INDICTMENT PROVIDES ADEQUATE NOTICE
        TO MIRZOYAN OF THE CHARGES AGAINST HIM

       Mirzoyan argues that the Indictment should be dismissed because it does not give him adequate notice of the charges against him.  In the alternative, Mirzoyan seeks a bill of particulars.  (Def. Br. (Dkt. No. 381) at 6)

       A.     **The Indictment Is Sufficiently Detailed**

       The Federal Rules of Criminal Procedure encourage succinct criminal pleadings. United States v. Earls, No. 03 CR. 0364(NRB), 2004 WL 350725, at *2 (S.D.N.Y. Feb. 25, 2004) (citing United States v. Stavroulakis, 952 F.2d 686, 693 (2d Cir. 1992).  Fed.R.Crim.P. 7(c)(1) mandates that an "indictment . . . be a plain, concise and definite written statement of the essential facts constituting the offense charged."  This rule is designed to ensure that a defendant receives "adequate notice of the charges to permit him to plead former jeopardy upon prosecution and to enable him to prepare a defense."  United States v. Hernandez, 980 F.2d 868, 871 (2d Cir.1992); see also United States v. Sabbeth, 262 F.3d 207, 217 (2d Cir. 2001). Ordinarily "an indictment need do little more than to track the language of the statute charged and state the time and place (in approximate terms) of the alleged crime."  Stavroulakis, 952 F.2d at 693 (citations omitted).  However, "tracking the language of the statute is only sufficient 'as long as those words of themselves fully, directly, and expressly, without any uncertainty or ambiguity, set forth all the elements necessary to constitute the offence intended to be punished.'"  United States v. Bin Laden, 91 F.Supp.2d 600, 609 n. 13 (S.D.N.Y. 2000) (quoting Hamling v. United States, 418 U.S. 87, 117 (1974)(internal quotations omitted).

       Mirzoyan does not dispute that the Indictment in this case tracks the statutory language, nor does he contend that it fails to allege every essential element of the offenses

charged.[12]  He simply argues that he is entitled to more.  The Court disagrees.  The 54-page

Indictment in this case includes all of the detail necessary to satisfy Rule 7(c).

### B.      Mirzoyan Is Not Entitled To A Bill Of Particulars

"Rule 7(f) of the Federal Rules of Criminal Procedure permits a defendant to

seek a bill of particulars where necessary to "prepare for trial, to prevent surprise, and to

interpose a plea of double jeopardy should he be prosecuted a second time for the same offense."

United States v. D'Amico, 734 F.Supp.2d 321, 335 (S.D.N.Y. 2010) (quoting United States v.

Davidoff, 845 F.2d 1151, 1154 (2d Cir.1988)).  "A bill of particulars is not a general

investigative tool, a discovery device or a means to compel the government to disclose evidence

or witnesses to be offered prior to trial."  United States v. Gibson, 175 F.Supp.2d 532, 537

(S.D.N.Y. 2001).  "Instead, its purpose is to supplement the facts contained in the indictment

when necessary to enable defendants to identify with sufficient particularity the nature of the

charges against them."  United States v. Gotti, No. S4 02 CR 743, 2004 WL 32858 (S.D.N.Y.

Jan. 6, 2004).  The decision to grant or deny a bill of particulars "rests within the sound

discretion of the district court."  United States v. Bortnovsky, 820 F.2d 572, 574 (2d Cir. 1987).

"Generally, if the information sought by defendant is provided in the indictment or in some

acceptable alternate form, no bill of particulars is required."  Id.

---

[12]  Mirzoyan claims that Count Three, conspiracy to commit bank fraud in violation of 18 U.S.C.
§ 1349, is insufficient in that does not allege an overt act.  (Def. Br. (Dkt. No. 381) at 7 and n.2)
Unlike Section 371, Section 1349 contains no overt act requirement, and courts have rejected the
argument that such a requirement should be read into the statute.  See, e.g., United States v.
Albers, No. 08 CR 819 (NG)(RML), 2011 WL 1225548, at *1 (E.D.N.Y. March 31, 2011).

Mirzoyan argues that Count Four, conspiracy to commit money laundering in violation of
§ 1956(h), is insufficient for the same reason.  (Def. Br. (Dkt. No. 381) at 7 n. 2)  The Supreme
Court has held, however, "that conviction for conspiracy to commit money laundering, in
violation of 18 U.S.C. § 1956(h), does not require proof of an overt act in furtherance of the
conspiracy."  Whitfield v. United States, 543 U.S. 209, 219 (2005).

Mirzoyan's reliance on Bortnovsky is misplaced.  In Bortnovsky, the indictment charged that the defendants "submit[ted] false claims for burglary losses to the Federal Insurance Administration" and the New York Property Insurance Underwriting Association.  820 F. 2d at 574.  After conviction at trial, the Second Circuit ruled that because the defendants had not been informed of the dates of the phony burglaries and the specific false claim documents, they were unable to prepare adequately for trial.  Moreover, the "relevance of key events was shrouded in mystery at the commencement of and throughout the trial."  Id. at 575.

There is no such mystery concerning the charges here.  The Government has provided Mirzoyan with sufficient information to prepare his defense, including a summary chart listing all of the allegedly fraudulent clinics, their addresses, the amounts that were billed to Medicare from these clinics, and the amounts that Medicare paid.  (April 17, 2012 Tr. at 35)  The Government has also provided defense counsel with the names of the doctors whose identities were stolen and used in furtherance of the alleged fraud scheme.  (Id.)

Mirzoyan has also received an enormous amount of discovery material, including the wiretap and search warrant affidavits – which lay out the Government's investigation in detail – transcripts of intercepted calls, and periodic reports and line sheets concerning the wiretaps.  These materials provide Mirzoyan with much of the information sought in the request for a bill of particulars.  (Apr. 17 Tr. at 13, 15, 19)  Mirzoyan has also had these materials for more than a year, giving him ample time to analyze them and prepare for trial.  (Id. at 13-15)

To the extent that Mirzoyan seeks to require the Government to list the dates and locations of meetings in which the purported conspiracies took shape, along with dates and locations of acts and conduct he is alleged to have performed, and his alleged role in the charged conspiracies, his request is improper.  The Government need not disclose the date a defendant is

alleged to have joined the conspiracy, the identities of all co-conspirators, the precise dates and

locations when and where defendants assisted the conspiracy, and the means by which

defendants furthered the conspiracy.  United States v. Barret, 824 F.Supp.2d 419, 439-40

(E.D.N.Y. 2011) ("'wheres, whens, and with whoms'" of conspiracy are "beyond the scope of a

bill of particulars").

   The Court is satisfied that the Government has met its discovery obligations and

that Mirzoyan has sufficient notice of the charges against him in order to adequately prepare for

trial.  Therefore, the Court declines to order a bill of particulars.

## V.  <u>SEVERANCE MOTION</u>

   Mirzoyan moves for a severance, claiming that it would be unfairly prejudicial for

him to be (1) tried with his co-defendants, and (2) tried simultaneously on all counts of the

Indictment.  Mirzoyan claims that the charges against him are misjoined under Fed. R. Crim. P.

8(b).

   To the extent that Mirzoyan's motion for a severance is addressed to trial with his

co-defendants, his motion will be denied as moot.  All but one of Mirzoyan's co-defendants have

pleaded guilty.  Defendant Karen Markosian is currently in California, where he was convicted

on other charges and is seeking a new trial.  (Apr. 17, 2012 Tr. at 2-3)  The Government has

agreed to try him separately, if necessary, as he is not named in the RICO count.  (May 2, 2012

Tr. at 35)  Accordingly, in the event that Mirzoyan proceeds to trial, he will be tried alone.  His

motion for a severance is therefore moot to the extent it is addressed to trial with his co-

defendants.

   As to misjoinder of offenses, Fed. R. Crim. P. 8(a) provides that the "indictment

. . . may charge a defendant in separate counts with 2 or more offenses if the offenses charged

. . . are of the same or similar character, or are based on the same act or transaction, or are connected with or constitute parts of a common scheme or plan."  Fed. R.Crim. P. 8(a); see United States v. Amato, 15 F.3d 230, 236 (2d Cir. 1994) ("Joinder [of offenses] is proper where the same evidence may be used to prove each count.")

   Mirzoyan is charged in six of the Indictment's seven counts.  All of the charges against Mirzoyan arise from alleged conduct that was part of a common scheme, with overlapping actors and actions.  All of the offenses are alleged to have been committed in connection with the RICO enterprise charged in Count One.  Counts Two (health care fraud), Three (bank fraud), Four (money laundering) and Five (identity theft) are similarly closely interconnected, and linked to the scheme to bilk Medicare through the use of stolen doctor/patient identities.  The alleged false statements made to banks in connection with opening accounts that would receive the proceeds of the health care fraud, and the subsequent laundering of those proceeds through various accounts and shell companies, was integral to the alleged racketeering enterprise.  Count Six, conspiracy to commit credit card fraud, is also alleged to have been committed in connection with the RICO enterprise, and involves overlapping participants.  Indeed, two of the alleged leaders of the racketeering enterprise – Mirzoyan and Terdjanian – are charged in that count.

   In sum, each of the counts in which Mirzoyan is named allege criminal conduct that is part of the pattern of racketeering in which the racketeering enterprise engaged.  It is clear that joinder of such interrelated offenses is appropriate under Rule 8(a).  See, e.g., United States v. Gotti, 42 F.Supp.2d 252, 289 & n.12 (S.D.N.Y. 1999) (joinder appropriate under either Rule 8(a) or Rule 8(b) because the conduct underlying the RICO count was related to conduct alleged in connection with other counts);  United States v. Rastelli, 653 F.Supp. 1034 (E.D.N.Y. 1986)

(where predicate acts could properly be considered part of a "pattern of racketeering activity,"

they constitute part of a "series of acts or transactions constituting an offense" for purposes of

joinder).

        Mirzoyan's motion for a severance as to (1) the charged offenses will be denied,

and (2) co-defendants, will be denied as moot.

## CONCLUSION

        Defendant Mirzoyan's pre-trial motions (Dkt. Nos. 324, 327, 330, 333, 336, 339,

342, 345, 348, 351, 354, 358, 359, 379, 389) are denied in their entirety. All other defendants'

pre-trial motions (Dkt. Nos. 261, 262, 272, 284, 289, 360, 372, 386, 387, 421) are denied as

moot. The Clerk of Court is directed to terminate the motions (Dkt. Nos. 261, 262, 272, 284,

289, 324, 327, 330, 333, 336, 339, 342, 348, 351, 354, 358, 359, 360, 372, 379, 386, 389, 421).

Dated: New York, New York
     May 18, 2012

                                 SO ORDERED.

                                 Paul G. Gardephe
                                 U.S. District Judge